## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARGARET BROCK AND ALFONZO A. BROCK; | |
| Plaintiffs, | CIVIL ACTION |
| vs. | No.: 2:10-cv-00687 |
| DANETTE THOMAS; TRINITY INSURANCE, ABSTRACT AND TITLE AGENCY, L.L.C.; UNIQUE MANAGEMENT AND CONSULTING SERVICES, L.L.C; LEONA HUDGINS; BYRON WHITE; SALVATORE ESPOSITO; AMERICAN ONE MORTGAGE; FRESH START FINANCIAL SERVICES; SILVER BUCKMAN; CYNTHIA FOXWORTH; VINCENT FOXWORTH; ACCESS ABSTRACT CORPORATION; JUAN ESCOBAR; SUPERIOR MORTGAGE CORPORATION; | |
| Defendants. | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### I.   Preliminary Statement

1.     This is an action brought in response to a wide-ranging, fraudulent, conspiracy to steal hundreds of thousands of dollars from a financially unsophisticated senior citizen and her bed-ridden, cognitively impaired, dying husband.  Defendants conspired to use long-standing relationships with Plaintiff, along with Plaintiff's vulnerable state-of-mind as she struggled with her husband's end-of-life care, to steal title to her lifelong home and to then distribute her equity to a dizzying mix of individuals and corporations.  Defendants then returned to Plaintiff numerous times, extracting even more

money from their unsuspecting victim, all the while working to deceive law-enforcement officials who began to investigate whether the Plaintiff was a victim of their conspiracy.

2.      According to the transaction documents, what occurred in October, 2007 was a sale of the residential property at 1611 Swain Street, Philadelphia, for $380,000.  In fact, most of that $380,000 was disbursed to Defendants, who not only *received* money for the "purchase," but also used Plaintiff's equity to funnel payments of tens of thousands of dollars to corporations created for the specific purpose of receiving money taken from unsuspecting victims in conspiracies such as this one.

3.      Plaintiff asserts damage claims against Defendants under RICO and under other federal and state law, as well as claims for attorney's fees and costs.  Further, Plaintiffs seek an order invalidating the fraudulent transfer of title.

## II.      <u>Jurisdiction and Venue</u>

4.      Plaintiff brings this action pursuant to 18 U.S.C. § 1964, which confers jurisdiction upon this Court over Plaintiffs' claims brought under RICO.  Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to 18 U.S.C. § 1965(a), which provides for venue in any district in which a RICO defendant transacts his affairs, and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## III.      <u>Parties</u>

6.      Plaintiff Margaret Brock is a natural person, and she resides in the property at 1611 Swain Street, Philadelphia, PA 19130.  This residence will be referred to hereafter as "the Brock Home" or "the Property."

7.     Plaintiff Alfonzo A. Brock is a natural person, residing at 3685 Park Hill Circle, Loganville, Georgia 30052.  Mr. Brock is the only child of Margaret Brock and her deceased husband, Alfonzo Brock.  Mr. Brock is a Plaintiff in this matter for Count XI only, as a beneficiary of his father's estate.

8.     Defendant Danette Thomas is an individual residing at 7575 Boulevard Avenue, Pennsauken, NJ 08110.

9.     Defendant Trinity Insurance, Abstract and Title Agency L.L.C. is a New Jersey corporation, located at 3641 Haddonfield Road, Pennsauken, NJ 08109, for which Danette Thomas was, or is, a co-owner and co-managing member.

10.     Defendant Unique Management and Consulting Services, L.L.C., is a limited liability corporation owned, upon information and belief, by Defendant Danette Thomas.  It is located at Danette Thomas' residence at 7575 Boulevard Avenue, Pennsauken, NJ 08110.

11.     Defendant Leona Hudgins is an individual believed to be residing at 136 Arbor Meadow Drive, Sicklerville, NJ 08081.

12.     Defendant Byron White is an individual, believed to be residing with Mrs. Thomas at her residence, at 7575 Boulevard Avenue, Pennsauken, NJ 08110.  Plaintiff is of information and belief that White is the son of Leona Hudgins.

13.     Defendant Salvatore Esposito is an individual, believed to reside at 3 Crestview Drive, Cherry Hill, NJ 08003.

14.     Defendant American One Mortgage is a corporation with a business address of 3 Crestview Drive, Cherry Hill, NJ 08003.  As indicated above, public records indicate that this address is also the home of the President of American One, Esposito.

15.     Defendant Fresh Start Financial Services is a corporation with an address of 560 Fellowship Road, Suite 101, Mount Laurel, NJ 08054.

16.     Defendant Silver Buckman is an individual residing at 1746 Morris Drive, Cherry Hill, NJ 08034.  Buckman both owned and operated Fresh Start Financial Services, and brokered mortgages for American One Mortgage.

17.     Defendant Cynthia Foxworth is an individual residing at 1 Lorne Road, Turnersville, NJ 08012.

18.     Defendant Vincent Foxworth is an individual residing at 1 Lorne Road, Turnersville, NJ 08012.  Together, the Foxworths are the parents of Buckman.

19.     Defendant Access Abstract Corporation is a corporation with a business address of 2173 MacDade Boulevard, Suite B, Holmes, PA 19043.

20.     Defendant Juan Escobar is an individual residing at an unknown address, and is a corporate officer of Defendant Access Abstract Corporation.

21.     Defendant Superior Mortgage Corporation is a corporation with a business address of 854 S. White Horse Pike, Hammonton, NJ 08037.

## IV.   Statement of Facts

### A.     The Criminal Conspiracy Generally

22.     Defendants Silver Buckman, Fresh Start Financial Services, American One Mortgage and Salvatore Esposito are members of an association-in-fact ("the Enterprise"), which started as early as October of 2006 and which, upon information and belief, continues today.

23.     The Enterprise has as its common purpose a criminal scheme of defrauding homeowners facing foreclosure or otherwise struggling financially, by

convincing them to convey their homes to the Enterprise under the guise of entering into purported one-year credit transactions to save their homes. In the course of these transactions, the Enterprise obtains financing for the disguised purchases, and then uses the proceeds of the loans—essentially stolen equity—to funnel payments to an array of associated individuals and corporations.

24. Buckman has generally been the point person for the Enterprise. Through referrals, mail solicitations or otherwise, she finds homeowners in foreclosure or otherwise struggling financially, and convinces those homeowners that they could save their home, and maintain their ownership rights through a one year credit transaction, usually called a "buyback loan" or a "bridge loan."

25. Each homeowner-victim was told that as part of the transaction, he/she would receive "credit repair" through Fresh Start Financial Services ("Fresh Start"), which would let him/her reacquire the homes at the end of the year period. In fact, no homeowners received anything resembling a program of credit repair.

26. The homeowner-victims were not actually participating in a credit repair transaction as promised, but were instead unwittingly selling their homes to the Enterprise's "investors," who were in reality a network of straw buyers- often family members of Buckman- who received kickbacks of thousands of dollars for serving as record owners of the properties.

27. The Enterprise made its money by brokering large loans on the properties through American One Mortgage ("American One"), a mortgage broker company that employed Buckman, and for which Salvatore Esposito served as President. Esposito

would receive American One's commission from the mortgage, and then, upon and information and belief, split it with Buckman at a pre-agreed to rate.

28.    Once the "investor" mortgage was brokered through American One, the Enterprise collected most of its money.  Rather then giving sale proceeds to the sellers (the homeowner-victims) of the properties, the Enterprise would instead take most of the money itself, distributing it to Fresh Start, individual straw purchasers, and numerous other corporations and individuals.

29.    Sherry Esposito is a  presumed family member of Salvatore Esposito, and public records indicate that both reside at the Esposito residence.  For many of the association's transactions, Salvatore Esposito or Sherry Esposito served as the appraiser, or an appraisal fee was listed as being paid to American One, presumably for the services of Esposito, a New Jersey-based appraiser.

30.    The victims of the scheme were generally told that their equity was simply going into "escrow," and that during the one year period of their "loan," the mortgage on the property would be paid by the Enterprise.  In fact, in each case, the Enterprise simply took most of the money, leaving the assorted victims in homes that were no longer in their names, with large unaffordable mortgages that were also not in their name, usually in foreclosure, and with all of their remaining equity having evaporated.

31.    Beginning at the latest in October of 2006, with interstate telephone solicitations and mailings sent to homeowner-victim William Nolde, the Enterprise used both the United States mail and interstate wire communications to further its scheme. The scheme continued with the mail and interstate wire communications used to induce additional homeowner-victims, to acquire payoff statements, to disburse moneys from the

scheme, to continue to deceive victims as to the nature of the transactions after they occurred, and even to deceive law enforcement officials. The use of the wires continues to the present time, with Buckman making interstate wire communications to homeowner-victim Jacquelyn Hughes as recently as March of 2010, and to Oren and Rainelle Barkley in April of 2010, to convince them that the fraudulent scheme is, in fact, legitimate.

32.     Of the thirteen currently known homeowner-victims, zero were able to re-take ownership after the "loan" or "buyback" period expired without the threat of litigation or the filing of a lawsuit, and each lost tens of thousands of dollars of home equity in the scheme. Meanwhile, a foreclosure was filed against virtually every "investor" for failure to make timely mortgage payments.

**B.      Facts Pertaining to the Plaintiffs**

33.     Plaintiff Margaret Brock ("Mrs. Brock") and her husband, Alfonzo Brock ("Decedent") were long term homeowners at the Property of 1611 Swain Street (hereinafter "the Property" or the "Brock Home.") As a result of a number of intra-family transfers, Mrs. Brock, Decedent, and Mrs. Brock's mother, Clara Benton, owned the Brock Home as joint tenants.

34.     Beginning in the late 1970s, Mrs. Brock and Decedent entered into a series of loans in order to make a number of repairs to their home. Immediately prior to 2006, Mrs. Brock and Decedent had a single lien against their home. The loan, held by Key Bank USA, N.A., carried an approximate balance of $80,000.

35.     In 2004, after a series of strokes, Decedent lost significant amounts of cognitive abilities. By 2006, Decedent was bedridden and cognitively impaired, spending

his days and nights in a bed placed in the first floor dining room of the Brock Home. Decedent was receiving regular home visits from his doctor, from Philadelphia Corporation for the Aging, and was receiving in-home hospice services for end-of-life care.

36. Mrs. Brock also had significant medical troubles, including eye and heart conditions.

37. While caring for her husband, Mrs. Brock was also caring for her elderly mother, Mrs. Benton. Mrs. Benton passed away in May of 2006. As a result of caring for two ill adults, as well as dealing with her own medical troubles, Mrs. Brock experienced financial difficulty.

38. In 2006, Mrs. Brock conveyed her worries to her friend, Leona Hudgins, with whom she had a long standing, 30-year relationship. Mrs. Brock was a regular customer of Hudgins' hairstyling business, and she and Hudgins were friends, with Mrs. Brock going so far as to give Hudgins the Brock family Cadillac when strokes prevented Decedent from using the car.

39. Mrs. Brock came to depend on Hudgins. For example, Hudgins would buy groceries for Mrs. Brock, who no longer had a car, and Mrs. Brock would then write Hudgins personal checks to both reimburse her for her expenses and to give her small payments for this service.

40. From this same relationship, Mrs. Brock knew Hudgins' son, Defendant Byron White, having first met him when White was a small child, thirty years earlier.

Loan One is Consummated

41.     Upon hearing of Mrs. Brock's financial problems, Hudgins told Mrs.
Brock that Hudgins' son, White, was newly working in the mortgage business, and could
get Mrs. Brock a loan that would relieve her of her financial problems.

42.     In the fall of 2006, White visited the Property with another man.  Loan
documents indicate that this person was Alim Wallace, an employee of American One.

43.     In the home, White convinced Mrs. Brock to apply to refinance her
$80,000 mortgage.

44.     Sometime shortly thereafter, the Brock Home was allegedly appraised by
Esposito, the President of American One.

45.     In November of 2006, as a result of White's work, American One
consummated a subprime, adjustable rate mortgage to Mrs. Brock, with WMC Mortgage
Corporation ("Loan One") as the mortgagee.  American One received fees totaling
$6,350 for broker services on Loan One, and Esposito received fees for his appraisal.

46.     Additionally, under White's instructions, Mrs. Brock wrote White a
personal check for $1,500, which White deposited or cashed.  The memo line of the
check states that it was written for "Fees."

47.     Upon information and belief, White is not a Pennsylvania licensed
mortgage originator.

48.     Loan One had abusive terms and provisions, including but not limited to
folding Mrs. Brock's unsecured debt into debt secured against the home, an adjustable
rate that was to reset to a higher rate twelve months after closing, and a pre-payment

penalty that White later ensured was triggered.  Finally, despite the loan being an adjustable rate mortgage, it could never decrease below its initial rate of 9.170 percent.

49.      In December of 2006, Mrs. Brock's son, Plaintiff Alfonzo A. Brock decided with his wife to move their family from Northeast Philadelphia to Atlanta, Georgia.

50.      Plaintiffs further decided that given Decedent's then need for intensive, end of life care, as well as Mrs. Brock's own age and medical difficulties, that Mrs. Brock could no longer care for the Decedent, and so, Decedent would move with Mr. Brock and his family to Atlanta.

51.      Mrs. Brock worried that her husband's end-of life care would cause a financial burden on her son and his family.  And as Loan One grew closer to its one year rate adjustment, Mrs. Brock further worried that she would have trouble making newly increased mortgage payments.

52.      In the spring or summer of 2007, Mrs. Brock told Hudgins about her worries.  Plaintiff, through investigation of counsel, is of information and belief that Hudgins told her friend, Defendant Danette Thomas, about Mrs. Brock's situation, and that Thomas, in turn, called Silver Buckman, owner of Fresh Start Financial Services.

The RICO Enterprise, the "Bridge Loan" and Transfer of the Brock Home

53.      Thomas is, or was, a co-managing member and co-owner of Defendant Trinity Insurance, Abstract and Title Agency L.L.C. ("Trinity"), a New Jersey based Title Company.

54.      In that conversation between Danette Thomas and Silver Buckman, and the conversations that followed, Thomas, Buckman and Hudgins decided on a course of

action for which the Buckman-Fresh Start-Esposito-American One Enterprise had significant experience: under the guise of a one-year credit transaction, taking title from Mrs. Brock's home, and converting the considerable equity that she had accumulated.

55.     In approximately August of 2007, Hudgins told Mrs. Brock that her son, White, could help her, by arranging a one-year "bridge loan," to ease Mrs. Brock's financial troubles, and pay for the care of her dying husband.

56.     White later confirmed to Mrs. Brock that he could arrange for a one-year loan, for $40,000.

57.     The "bridge loan" in this context was a fictitious term, used by Defendants again and again, to confuse and defraud Mrs. Brock into transferring title to her life-long home to Defendants for a fraction of its value.

58.     In August of 2007, White told Mrs. Brock that the financing for this "bridge loan" would be arranged through the company that he was newly starting with, Trinity, along with his supervisor at Trinity, Thomas.

59.     White further stated that the transaction would probably be financed by two investors, Cynthia and Vincent Foxworth ("The Foxworths").

60.     Approximately two weeks later, Thomas came to the Brock Home, along with White and Hudgins. Thomas gave Mrs. Brock a copy of her Trinity business card, and told her that she would be the representative of the investors who would finance the transaction.

61.     Mrs. Brock was told by White and Thomas that she would receive a $40,000, one-year loan, that she would continue living in her home, and that at the end of one year, she would refinance the transaction.

62.     These details were also generally conveyed to her son, Mr. Brock, who was in the Property at the time, and who stated that he did not understand the transaction. White told him in response that he and his mother had known Mrs. Brock for years, and that they would never take advantage of her.

63.     Mrs. Brock also told Thomas, White and Hudgins that she didn't understand the terms of this transaction. Hudgins told her not to worry, because she herself had received a "bridge loan" before, and that it had worked out well. Hudgins told Mrs. Brock to "just stay well," and that at the end of 12 months, the transaction would be refinanced, and the Property would be returned to Mrs. Brock without any encumbrances.

64.     Mrs. Brock was still confused about the terms of the transaction, but relied on the continued and regular assertions from Thomas, White and Hudgins that after a year, the loan would come due, and she would retake all rights to her home.

65.     On or about September 7, 2007, Thomas, White and Hudgins again entered the Brock Property. In the Property they confirmed that the Foxworths would be the investors for this transaction.

False Power of Attorney Signed in a Dining Room Bed

66.     Thomas told Mrs. Brock that in order for the transaction to be completed, they needed Decedent to sign a Power-of-Attorney form ("POA").

67.     Mr. Brock was in his parents' house at the time, and told Thomas, in clear and explicit terms, that his father was cognitively impaired, and could not understand any legal documents that she wished him to sign.

68.     Thomas, neither a lawyer nor a doctor, told Mr. Brock that Decedent looked fine.  Thomas then took the Power-of-Attorney form to Decedent, in his hospital bed in the Brock dining room, and held it while he signed it.

69.     At the time of his signature, Mr. Brock was bedridden, cognitively impaired, and incapable of understanding the document that was handed to him.

70.     Further, the POA that Decedent signed from his bed, in his Philadelphia home, falsely indicated that Decedent was signing the document in New Jersey.  It was notarized by Defendant Thomas, a New Jersey Notary, and included references to New Jersey statutes.  The POA is hereto attached as Plaintiffs' Exhibit 1.

71.     This same POA that Decedent signed, in his Philadelphia home, failed to include notices specifically required by the Commonwealth of Pennsylvania in POA's, pursuant to 20 Pa.C.S.A. § 560l.

The Misleading Agreements

72.     Thomas, White and Hudgins next instructed Mrs. Brock that she also had to sign a document for the transaction to proceed, which she was not given time to read.  A review of documents indicates that it was likely an Agreement of Sale of the Property to the investors that Defendants located, the Foxworths.

73.     Upon information and belief, investigation of Plaintiffs' counsel indicates that the Agreement was prepared by Buckman, doing business as Fresh Start, who gave it to Thomas.

74.     Under Defendants' specific instructions and relying on Defendants' assertions that she would still retain rights to her home after one year, Mrs. Brock signed the Agreement.

75. After Mrs. Brock signed the Agreement, Defendants took the documents from her without giving her copies of them.

76. The Agreement contained terms that Defendants never intended to fulfill, and other terms that are contradictory and purposefully confusing. For example, within the same page, and even within the same sentence, the Agreement lists various sales prices of the Property, including $400,000, $380,000 and $340,000.

77. Further, the Agreement specified that prior to the sale, the Foxworths paid Plaintiff a deposit of $20,000. Plaintiff received no such payment.

78. On September 20, 2007, prior to any closing at the Brock Home, Mr. Brock called Thomas, at Trinity, and again informed Thomas that due to Decedent's cognitive problems, Decedent could not properly give consent to a POA.

79. Mr. Brock also demanded copies of all Agreements that were signed on September 7, 2007. From her fax machine at Trinity, Thomas faxed Mr. Brock documents, which included the Power-of-Attorney form that Decedent signed, but did not include the Agent Acknowledgment Form required in Pennsylvania Power-of-Attorney documents, pursuant to pursuant to 20 Pa.C.S.A. § 560l.

80. On October 9, 2007, Plaintiff Mr. Brock, who had been living apart from his wife and children as he awaited a final transfer from his job, completed his move to Atlanta, taking with him Decedent.

Consummating the Superior Loan to Fund the Scam

81. Defendant Access Abstract Corporation ("Access Abstract") agreed to serve as the title, settlement and escrow agent for the loan from Superior Bank.

Investigation of Plaintiff's counsel indicates that Access Abstract served as closing agents for the Enterprise on multiple occasions.

82.     Defendant Juan Escobar, an officer of Access Abstract, handled the transaction on behalf of Access Abstract.

83.     Escobar prepared checks in anticipation of the closing, presumably reviewed the POA, and prepared a Deed to convey the Property to the Foxworths, which states that Mrs. Brock was the Attorney-In-Fact for Decedent.

84.     On October 19, 2007 the following persons arrived at and entered the home of Mrs. Brock:  White, Thomas, Buckman, Cynthia Foxworth, Vincent Foxworth and Escobar.  Buckman was accompanied by a small child.  This was the first time Mrs. Brock met the Foxworths, Buckman, or Escobar.

85.     Mrs. Brock did not know at the time, but has since learned that Vincent Foxworth is a New Jersey-based Real Estate Agent.

86.     Mrs. Brock, unrepresented and alone for the entire transaction, sat at her kitchen table with Thomas and Buckman, with White standing behind her.

87.     Escobar and the Foxworths sat in the living room, with Escobar coming into the kitchen once.  He asked Mrs. Brock about the death of her mother, had a short, inaudible conversation with Buckman, and then went back in the living room, while he let Thomas and Buckman actually handle the closing.

88.     Buckman told Mrs. Brock that she, through her parents, the Foxworths, would be controlling the Property for one year, before it would revert to Mrs. Brock's control.

89.     Mrs. Brock, while still unclear on the specifics of the transaction, relied on this representation made by Buckman, and prior representations by Buckman, Thomas, White and Hudgins, that this was a one-year transaction that would give $40,000 of credit to Mrs. Brock.

90.     Mrs. Brock was instructed to sign documents by Defendants.

91.     As soon as Mrs. Brock signed each document, and before she could fully read them, Thomas took the documents from her, and told her that she would be taking them back to her office, to make sure that everything was done correctly.

92.     As Thomas took the documents, White stated to Thomas that it was wrong to take the documents from Mrs. Brock.

93.     Mrs. Brock never received any documents from the transaction until they were obtained by her counsel in September of 2009.

<u>The Paper Trail and Red Flags</u>

94.     Prior to arriving at the Property, Escobar prepared a HUD-1 Settlement statement for the transaction evidenced by this deed transfer, hereto attached as Plaintiffs' Exhibit 2.  The document states, among other things:

a.  The "Place of Settlement" is falsely listed as 2173 MacDade Blvd, Suite E, Holmes, PA 19043.  Public records indicate that this address is the office of Access Abstract.  In fact, the settlement took place in the Brock home at 1611 Swain Street.

b.  On Line 202, financing from a $342,000 loan ("Loan Two"), originated by Defendant Superior Mortgage Corporation ("Superior").  The proceeds of

Loan Two were then distributed amongst assorted Defendants as described below.

c.  On Line 507, a $99,256.99 payment to Fresh Start.

d.  On Line 518, a $67,517.37 payment to "UNQ MNGMT & CONSULTING SVC, LLC."  Plaintiffs believe this abbreviation indicates a payment to Defendant Unique Management and Consulting Services, L.L.C. ("Unique Management").

e.  On Line 504, a $127,900.95 mortgage payoff of the loan that was brokered to Mrs. Brock only eleven months prior by White and American One.

f.  On Line 804, a $3,591.00 broker payment to American One.

g.  On Line 201, a $20,000 "Deposit retained by seller," which presumably refers to the $20,000 deposit stated in the Agreement of Sale.  Mrs. Brock never received a $20,000 deposit.

h.  On Line 209, a seller contribution of $7,600, which Mrs. Brock did not make, and did not have any knowledge of.

i.  On Lines 1101 through 1113, and Lines 1303 through 1305, a total of $2,114.01 in settlement costs for the services of Abstract Access, represented at closing by Escobar.

j.  On Line 603, despite a purported sale price of $380,000, a total of $49,999.90 in payments made to Mrs. Brock.

95.  Apparently based on an invoice dated October 18, 2009, hereto attached as Plaintiffs' Exhibit 3, Defendant Escobar wrote a $99,256.99 check to Fresh Start.

96.     The $99,256.99 check to Fresh Start was deposited by Buckman on October 23, 2007.

97.     The description of the purported services rendered by Fresh Start, for which it received $99,256.99 from Mrs. Brock, states "Real Estate Services: Location of buyer and preparation of sales contract.  Review all related documents such as appraisal and title.  Correspond with mortgage company for updates."

98.     The "buyer" that was "located" by Buckman was her parents, Vincent and Cynthia Foxworth.

99.     The review of "all related documents such as appraisal and title" is, in fact, the description of settlement services provided by a Settlement Agent and a Title Agent.  These are services for which Access Abstract and Escobar already duly paid themselves at least $2,114.01, in their role as title agent and representative of Superior Mortgage.

100.    The role of corresponding "with mortgage company for updates" describes the role of a mortgage broker, a service for which American One was duly compensated $3,591.00, as noted by Escobar, on line 804 of Plaintiffs' Exhibit 2.

101.    Plaintiff, through investigation of counsel, is of information and belief that from the Fresh Start proceeds, Buckman then paid her parents, the Foxworths, a $10,000 kickback for acting as the straw buyers.

102.    Also on October 19, 2007, Escobar sent a wire of $67,517.37 to Unique Management, apparently based on their October 18, 2007 invoice, which is hereby attached as Plaintiff's Exhibit 4.

103.    The totality of the description of the services rendered by Defendant Unique Management is "Professional Services."

104.    Previous to her counsel's investigation in 2009, Mrs. Brock had never heard of Unique Management, nor can she indentify a single service that was provided to her by Unique Management.

105.    Investigation by Plaintiff's counsel indicates that Unique Management is a limited liability corporation incorporated by Thomas, with a mailing address of Thomas' home.

106.    Also on October 19, 2007, Defendant Escobar sent a check of $127,900.95 to Washington Mutual to pay off Loan One.

107.    Loan One was brokered to Mrs. Brock less than one year prior, by American One and White, and this quick payoff triggered prepayment penalties on that same loan.

108.    Investigation by Plaintiff's counsel indicates at some date after the closing, Esposito then paid part of American One's proceeds from the transaction back to Buckman, for brokering the transaction.

109.    Finally, on October 19, 2007, Defendant Escobar wired $49,999.90, the entire remaining proceeds of Mrs. Brock's sale, to a Commerce Bank account in New Jersey, registered to both Mrs. Brock and Hudgins.

110.    The Commerce Bank account was an account that Hudgins helped Mrs. Brock open, as a second checking account to have in case of emergencies.  Mrs. Brock does not recall why Hudgins was given access to the account.

111.    At the closing, still trusting that Defendants had provided her with a service of helping her find a loan, Mrs. Brock wrote individual checks to White, Thomas and Hudgins for $500.00, $500.00 and $1,000.00, respectively.

Continued Theft after Closing

112.    Still unsatisfied with the moneys that they extracted from Mrs. Brock, Defendants then set upon additional schemes to take more money from her.

113.    First, in order to maintain control over the vulnerable, unrepresented, and isolated Mrs. Brock, Defendants took steps to keep control of the sole payment that was actually made to her, and which she believed to be the proceeds from her loan.

114.    Not only did Hudgins have access to the Commerce account, but she convinced Mrs. Brock, by telling her that she was sick and alone, that is was in her best interests to change the mailing address of the bank account to 1415 Fitzwater St, Philadelphia, PA, 19146, so that Hudgins could manage the money for her.  A review of public records indicates that this is the business address for the hair salon owned and operated by Hudgins.

115.    Over the course of the next eighteen months, Hudgins used her signing power on the account, and removed approximately $20,000 dollars of the money sent to this account on behalf of Mrs. Brock.

116.    Next, over the course of the next number of months, Hudgins and White twice convinced Mrs. Brock to make additional payments to White, to "clean up her credit."  They convinced Mrs. Brock to pay $1,300 and $3,900 to White for this supposed credit repair service.  Hudgins and White convinced Mrs. Brock that these payments were

necessary in order to improve her credit so that the Brock Home would come back into her control at the end of the twelve month period.

117.    Upon information and belief, despite taking Mrs. Brock's money for credit repair services, White provided no such services.

118.    During the one-year period, Buckman made at least one interstate call to Mrs. Brock, in her home, where Buckman discussed a water bill charge on the home, and talked about Mrs. Brock's "responsibilities" under the terms of her "bridge loan."

119.    When a year expired, Mrs. Brock asked about the one-year transaction having come due.   Her inquires were evaded by Defendants, who responded by asking her for more personal information, such as her social security number and pension information, and by telling her that if she didn't wait longer, she would lose everything.

120.    In December of 2008, Plaintiff Mr. Brock filed complaints against Thomas, Trinity, Hudgins, and White with a number of agencies, including the Pennsylvania Attorney General's Office.

121.    In response, the Pennsylvania Attorney General's Office opened an investigation into the matter.

Deceiving the Investigative Authorities

122.    After receiving word of the investigation, Defendants set upon a conspiracy to deceive authorities about their actions.

123.    On February 12, 2009, in collaboration with Thomas, Hudgins entered the Brock home, and told Mrs. Brock that she had to write a letter stating that Mrs. Brock did not file complaints against Hudgins, White or Thomas.

124.     Hudgins used her power to influence Mrs. Brock, and used her power over Mrs. Brock to convince her to write the letter ("the 2/12/2009 Letter"). Although Mrs. Brock did write the letter, the letter absolved no parties of their culpability in the actions of the conspiracy.

125.     On March 3, 2009, in response to inquiries from the Pennsylvania Attorney General's office, Thomas wrote a letter to Ann-Marie Hannam, of the Pennsylvania Attorney General's Office. A copy of the Letter is hereto attached as Plaintiffs' Exhibit 5.

126.     In her letter to the Pennsylvania Attorney General, Thomas references the 2/12/2009 Letter, and states that neither she, nor Trinity, were licensed to conduct business in the Commonwealth of Pennsylvania.

127.     In this same letter to the Attorney General's Office, and despite overwhelming evidence to the contrary, including her personal Trinity business card, her position as co-managing member at Trinity, Trinity's fax number imprinted on documents, her signature on documents, and her notary stamp, Thomas stated that "No Representative of Trinity Insurance Abstract & Title Agency was involved with the transfer of this property."

Continuing the Fraud

128.     Still not satisfied with the results of their fraudulent scheme, and apparently confident that their scheme to deceive law enforcement was successful, Defendants used multiple stories to attempt to extract more money from Mrs. Brock.

129.     In February and March of 2009, Hudgins and Thomas, through in-person visits and telephone calls, told Mrs. Brock that she needed to pay anywhere from $20,000 to $40,000 to bring the loan current.

130.     In August of 2009, Hudgins called Mrs. Brock to tell her that Cynthia and Vincent Foxworth, through Buckman, were instructing Mrs. Brock that if she wanted to save her home, that she would have to pay Defendants $2,000 per month for a 'modified mortgage.'

131.     Hudgins further threatened that if she did not pay the Foxworths, that Defendants would let the Property be sold at Sheriff Sale.  In fact, the Property was already foreclosed and scheduled for Sheriff Sale by the subsequent owner of Loan Two, Wells Fargo, due to a lack of payments by the Foxworths.  The Sheriff Sale was delayed only when Mrs. Brock sought the assistance of counsel, who reached an agreement with Wells Fargo to delay the sale.

132.     After this August 2009 conversation, Mrs. Brock, beginning to understand the scope of the fraud that had been perpetrated on her by the conspiracy, stopped answering calls from Hudgins and Thomas, who continued to call her regularly.

133.     In October of 2009, apparently unsatisfied with being ignored by Mrs. Brock, Hudgins arrived at the Brock Home after dark, and told Mrs. Brock that if she didn't let her in, Hudgins would call the police and tell them that she thought Mrs. Brock was in dire medical trouble.  Feeling that she had no choice, Mrs. Brock let Hudgins in.

134.     Inside the Brock Home, Hudgins told Mrs. Brock that Thomas and Buckman needed her pension statements and other information, so that they could get Ms. Brock a loan modification from Wells Fargo.  She said that with this new agreement,

Mrs. Brock would be a renter, with the Foxworths as her landlord. Mrs. Brock refused this offer.

135. In October of 2009, Mrs. Brock located the Commerce (now TD Bank) Account, where her "loan" proceeds were sent. An examination of bank records shows that the account was closed by Hudgins in August of 2009.

136. As a result of the fraudulent transaction, the Brock Home is now in the name of Cynthia and Vincent Foxworth, with a sheriff's sale pending, and a judgment lien against the home of at least $372,216.59.

137. Mrs. Brock has at all times believed the Property to be hers, has fully expected to keep her home until the end of her natural life, and has shown this belief continually and repeatedly.

138. The fraud perpetrated against Mrs. Brock was part of a much larger pattern of fraudulent activity perpetrated against vulnerable homeowners in multiple counties in both Pennsylvania and New Jersey by Buckman, Fresh Start, Esposito and American One.

139. This pattern of fraudulent activity includes, but is not limited to, actions evidenced in *Wilson v. Fresh Start*, filed in Burlington County, New Jersey in 2007, *Chambers v. Foxworth*, filed in Philadelphia in 2008, and the additional homeowner-victims described below.

140. Mrs. Brock intends to spend the rest of her life in the Property, prior to willing it to her child and grandchildren, as her parents gave it to her. The impact of this fraudulent scheme has not only resulted in the loss of her home and hundreds of thousands of dollars in equity, but has caused her enormous stress and mental anguish.

## V.    Causes of Action

### Count I:  Violation of 18 U.S.C. §1962(c)

**Margaret Brock vs. American One Mortgage; Silver Buckman; Fresh Start Financial Services; Salvatore Esposito**

141.    Plaintiff's incorporate paragraphs 1 through 140 by reference as if set forth fully herein.

142.    Defendants Buckman, Fresh Start, American One and Esposito formed and participated in an "enterprise" consisting of an "association-in-fact" as those terms are used in 18 U.S.C. §1961(4) (hereinafter "the Enterprise").  The Enterprise had as its common purpose a scheme to defraud financially distressed homeowners out of the title to their homes and out of their equity.

143.    The Enterprise began as early as 2006 and has acquired at least thirteen separate deeds in its scheme, generally employing as its core misrepresentations that that conveyances are intended to be temporary transfers connected to debt repair services and loan transactions to be provided to the victims.

144.    Each of the RICO defendants played a distinct role in the Enterprise, participating in its affairs in the following ways:

      a.    Buckman is the point person of the Enterprise.  An apparent mortgage broker in New Jersey, she is also the main "salesperson" of the Enterprise's services, pitching homeowners through phone calls, emails and mailings on the chance to "save" their homes through the one-year transaction.

      b.    Fresh Start is the credit repair corporation that homeowners are told will fix their credit, and through which much of the proceeds from the sale are

funneled from the proceeds at closing. For example, in the instant case, Fresh Start received a payment of $99,256.99 from the proceeds of the Brock home.

c.  American One is a New Jersey based mortgage broker corporation, who, besides their normal work in New Jersey, brokered each loan that funded the Enterprise's scheme, receiving fees for each loan.

d.  Esposito is the President of American One. Upon the brokering of a loan on the property of a homeowner-victim, he would then split American One's fees for the transactions of the Enterprise with Buckman at a pre-agreed to rate. In addition, Esposito, a licensed appraiser, or his presumed family member, Sherry Esposito, appraised multiple of the homeowner-victims' properties, for which he or American One would receive additional fees.

145.  The Enterprise is engaged in activities which affect interstate commerce in that it is a New Jersey set of actors that conspired to take title and equity from homeowners in both New Jersey and Pennsylvania, and that it used a series of state and national mortgage companies to fund the scheme.

146.  Buckman, Fresh Start, Esposito and American One ("the RICO Defendants") are "persons" as that term is used in 18 U.S.C § 1961(3).

147.  The Enterprise used the United States mail and interstate wire communications to further its fraudulent scheme, beginning at the latest, in October of 2006, with interstate telephone solicitations and mailings sent from Buckman and Fresh Start to homeowner-victim William Nolde, in Philadelphia, and in 2007 and 2008, with

mailings and use of interstate wire communications in furtherance of the scheme against Mrs. Brock.

148.    The conduct of the RICO Defendants, as described above, constituted the execution of a multi-year ongoing scheme to obtain money and property by means of false and fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341. Their use of the U.S. mail included soliciting homeowner-victims, including William Nolde in 2006, Katherine Powell in 2007, and Mario Maldonado in 2008. One such mail solicitation, sent from Fresh Start to Katherine Powell, is hereby attached as Plaintiff's Exhibit 6.

149.    In the instant case, use of the mails included mailing disbursement checks after closing in October of 2007, and using the mail to deceive law enforcement officials who opened an investigation into the matter.

150.    The conduct described above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

151.    The conduct of the RICO Defendants, as described above, constituted the execution of a multi-year, ongoing scheme to obtain money and property by means of fraudulent pretenses and representations through the use of interstate wire communication, in violation of 18 U.S.C. § 1343. Their use of the interstate wire system includes:

   a.  Interstate phone calls to solicit loans, beginning, at the latest, in October 2006, with a call from Buckman to William Nolde, and with a November, 2006 interstate telephone call from Esposito to Nolde. Interstate phone calls to further the scheme continued, including but not limited to

interstate calls made to Edward Harper in 2007, Margaret Brock in 2008, and Rainelle Barkley in 2010.

b. Routine interstate emails to further the scheme, including at least 13 from 2008 through 2010 sent by Buckman in New Jersey to Pennsylvania homeowner-victim Jacqueline Hughes.

c. Interstate faxes sent to homeowner-victims and interstate faxes received from mortgage companies for payoff statements, including a loan payoff statement for Mrs. Brock's mortgage, apparently solicited by, and then faxed to Buckman in October of 2007.

d. Wiring of settlement proceeds from homeowner-victims. In the instant case, on or around October 19, 2007, the Enterprise caused and oversaw the interstate wiring of tens of thousands of dollars in proceeds from Mrs. Brock's sale.

152. The conduct described above constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

153. Upon information and belief, in addition to Mrs. Brock and Mr. Nolde, similar mailings and/or interstate wire communications were sent by the members of the Enterprise from 2006 through 2010. Upon information and belief, these mailings and interstate wires were used to solicit victims, to receive mortgage commissions and appraisal fees sent to Esposito at American One, to send money to additional shell corporations, to confuse victimized homeowners as to legal the status of their homes, and otherwise further the Enterprise's activities directed to, at minimum, the following additional homeowner-victims:

a. Edward Harper (Philadelphia, Pennsylvania), in 2007 and 2008;

b. Linda Chambers (Philadelphia, Pennsylvania) in 2007;

c. Jacquelyn Hughes (Bristol, Pennsylvania), in 2008, 2009 and 2010;

d. Oren and Rainelle Barkley (Philadelphia, Pennsylvania), in 2008, 2009 and 2010;

e. Elbert Pace (Glassboro, New Jersey) in 2008;

f. Mario Maldonado (Glassboro, New Jersey), in 2008;

g. Mattie Wilson (Willingboro Township, New Jersey), in 2007;

h. Heather Passamore (Aston, Pennsylvania), in 2006;

i. Katherine Powell (Stockton, New Jersey) in 2007;

j. Delores Pryce (Salem, New Jersey) in 2007;

k. Earl Gibbs (Jersey City, New Jersey) in 2007 and 2008;

154. The RICO Defendants participated in the affairs of the Enterprise through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §1961(5), more specifically, through a pattern of mail and wire fraud, as described above.

155. The unlawful conduct of the RICO Defendants injured, at minimum, Margaret Brock as well as the additional named homeowner-victims, and was continuous and open ended, with interstate wires continuing the scheme continuing with communications to homeowner-victim Jacqueline Hughes in March of 2010, and Oren and Rainelle Barkley in April of 2010.

156. Alternatively, the unlawful conduct of the RICO Defendants, conducted through the Enterprise, which injured Mrs. Brock and the additional identified

homeowner-victims, started at least as early as October of 2006 and continued through April of 2010, meeting the burden of closed end continuity.

157.    Mrs. Brock was an intended target of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Defendants.  The financial harm suffered by Mrs. Brock was by reason of said conduct and was the direct result of such conduct.

158.    Pursuant to 18 U.S.C. § 1964(c), Mrs. Brock is entitled to treble damages, together with reasonable attorney's fees and costs.

### Count II:  Violation of 18 U.S.C. §1962(d)
### Margaret Brock vs. All Defendants

159.    Plaintiffs incorporate paragraphs 1 through 158 by reference as if set forth fully herein.

160.     In addition to the members of the Enterprise, other individuals, in particular, Defendants Thomas, Trinity, Unique Management, White, Hudgins, Escobar, Access Abstract and Superior conspired amongst themselves and others to violate 18 USC § 1962(c), in violation of 18 USC § 1962(d).  More specifically, with knowledge of the Enterprise's criminal purposes, they facilitated and furthered those purposes with the assistance described below.

161.    Defendants Buckman, Fresh Start, American One, Esposito, Thomas, Trinity, Unique Management, White, Hudgins, Escobar, Access Abstract and Superior are "persons" as that term is used in 18 U.S.C. 1961(3).

162.    Thomas, as one of the front persons for the conspiracy in the instant case, made numerous false and deceptive representations to Mrs. Brock about the nature of the transaction, received $67,517.37 from the closing, for which she used Unique

Management to funnel money, and then made false statements to law enforcement officials investigating the matter.

163. White and Hudgins connected Mrs. Brock to the Enterprise, served as two additional front persons for the conspiracy, and made numerous false and deceptive representations to Mrs. Brock for the purposes of inducing her into the transaction.

164. Escobar and Access Abstract, in their search for profits for their settlement and title work conspired to further the Enterprise by facilitating the transaction by preparing a HUD-1 marked with obvious signs of fraud, acquiring title insurance for the property, allowing Buckman and Thomas to assume Access Abstract's normal functions during settlement, and by sending payments of tens of thousands of dollars to multiple corporations set up to receive payments in conspiracies such as this one. They knew, or deliberately closed their eyes to what would have been otherwise obvious to them, namely that the transaction, including payments made by them of over $160,000 to Fresh Start and Unique Management were nothing more than the theft of a vulnerable and isolated senior citizen's home equity.

165. Further, the relationship between Escobar, Access Abstract and the Enterprise was not limited to this single transaction. Access Abstract and Escobar performed a similar role in the Enterprise's fraudulent transfer and equity theft of homeowner-victims Elwood Pace, Jacquelyn Hughes, Edward Harper, Earl Gibbs and Oren and Rainelle Barkley. A HUD-1 Settlement Statement prepared by Access Abstract and Escobar for the supposed home sale of Edward Harper, another Philadelphia-based senior citizen, is hereby attached as Exhibit 7.

166.     Superior, in their search for profits for their mortgage business, conspired to further the Enterprise.  They knew, or deliberately closed their eyes to what would have been otherwise obvious to them, that the RICO Defendants were involved in the underlying scheme to take the title and home equity of Mrs. Brock.  They demonstrated this knowledge or willful blindness by allowing Buckman to perform many of their own functions, and by approving a mortgage and disbursements for a set of homeowners (the Foxworths), who had "purchased" at least eight other properties in the previous 10 months alone, and which, on their face, showed obvious signs of fraud.

167.     Vincent and Cynthia Foxworth, in their search for profits, conspired to further the Enterprise by willingly and knowingly serving as straw buyers of the Brock Property, in exchange for a $10,000 payment from Buckman, their daughter.  Further, the Foxworths' actions were not limited to this single transaction.  In fact, they also served as the straw buyers for, at minimum, the Enterprise's fraudulent transfers of the homes of homeowner-victims Katherine Powell, William Nolde, Linda Chambers, and Ronald and Mattie Wilson.

168.     Trinity, in its search for profits, conspired to further the Enterprise through the use of company resources to further the scheme, and for the actions of their co-managing member, Thomas.  Further, Trinity was a multiple time business partner with the Enterprise, serving as the closing agent in thefts from homeowner-victims Katherine Powell, Mario Maldonado and Ronald and Mattie Wilson.

169.     Mrs. Brock was an intended target of the scheme to violate RICO.  In the participation of the above named Defendants to facilitate that scheme, in violation of 18

U.S.C. §1962(d), Mrs. Brock suffered financial injury which was a reasonably foreseeable consequence of, and a direct result of, such conduct.

### Count III- Fraud
### Margaret Brock v. All Defendants

170.    Plaintiff's incorporate paragraphs 1 through 169 by reference as if set forth fully herein.

171.    Defendants knowingly made numerous purposeful and material misrepresentations to Mrs. Brock about the nature of the transaction that occurred in October of 2007, and about the content of the documents that she was signing, in order to induce her to enter into the subject transaction.  These statements include, but are not limited to:

    a.  Hudgins, Thomas, White, and Buckman, orally stating to Mrs. Brock that she would receive a $40,000 loan, when she was in fact selling her home.

    b.  Thomas, White and Buckman telling Mrs. Brock that documents that she was signing would give her a $40,000 loan, when they actually were transferring her home.

    c.  Hudgins, Thomas, and White stating to Mrs. Brock that after a one-year period, Mrs. Brock would refinance this transaction, and would retain all ownership rights in her home.

    d.  Hudgins stating to Mrs. Brock that she herself received the same kind of one-year "bridge loan."

    e.  White and Hudgins later demanding up front payments of $1,300 and $3,900 for credit repair so that Mrs. Brock could get her home back, despite zero intention to provide Mrs. Brock with any services whatsoever.

172. Defendants knew at all times that their representations were false.

173. Defendants made these representations with the intent to induce reliance on them on the part of the elderly Mrs. Brock, as well as to confuse her as to what the documents were that she was signing.

174. Mrs. Brock relied on these representations.

175. Mrs. Brock's reliance was reasonable given her age, her fragile state of mind, and the power imbalance created by the 30-year relationship that she had with Hudgins.

176. As a result of Defendants' fraudulent conduct, Mrs. Brock suffered economic and emotional damages.

177. Defendants conduct constituted both fraud in the inducement and fraud in the execution.

178. Economic damages proximately caused by Defendant's misrepresentations to Mrs. Brock equal $372,216.59, the value of the lien encumbering her home, plus any and all additional payments made to Defendants, minus the actual economic benefit that she received.

179. Trinity is liable for the actions of its co-managing member and owner, Thomas.

180. American One is liable for the acts of its alleged employee, Buckman, and for the acts of its owner, Esposito.

181. Escobar, Access Abstract, Esposito, American One, Vincent Foxworth, Cynthia Foxworth and Superior are liable for fraud claims as a result of the conspiracy,

alleged *infra* in Count VIII and for aiding and abetting the underlying scheme, alleged *infra* in Count IX.

### Count IV- Unfair Trade Practices and Consumer Protection Law
#### Margaret Brock v. All Defendants

182.     Plaintiffs incorporate paragraphs 1 through 182 by reference as if set forth in full herein.

183.     The transactions that resulted in the loss of title to Mrs. Brock's home were purchases of services for personal, family or household purposes, to wit, a putative sale, loan, credit repair and other services; as such, the transactions are covered under the Unfair Trade Practices and Consumer Protection Law 73 P.S.§201.92(a)("UTPCPL").

184.     The conduct of Defendants, including, but not limited to each averment of Counts I, II and II, constituted "unfair and deceptive acts or practices" under 73 P.S. § 201-2(4), in that, among other things, Defendants represented the transaction to Plaintiff as having characteristics, uses and benefits that it did not have and engaged in fraudulent and deceptive conduct, as described above, that created a likelihood of confusion or misunderstanding.

185.     As a result of these unfair and deceptive acts or practices by Defendants, Mrs. Brock suffered ascertainable loss, represented by the $372,216.59 lien encumbering her home, as well as the loss of title to her home.

186.     Under 73 P.S. § 201-9.2, Mrs. Brock is entitled to damages up to three times the amount of her loss, plus attorney's fees and costs.

## Count V- Real Estate Settlement Procedures Act
### Margaret Brock vs. All Defendants

187.    The allegations in Paragraphs 1 through 187 are incorporated as if set forth fully herein.

188.    The Superior Mortgage loan used to finance the fraudulent conveyance of the Brock Home is a federally related mortgage loan within the meaning of the Real Estate Settlement Procedures Act (hereinafter RESPA), 12 U.S.C. § 2602.

189.    Access Abstract received approximately $2,114 in fees for settlement and closing costs for the Brock transaction.

190.    Superior, through Access Abstract, paid American One $3,591 in fees concerning this transaction, presumably for the work of Buckman.  Esposito then split this money with Buckman.

191.    On top of the title and settlement fees paid to Access Abstract, American One and Superior, Superior, Access and Escobar also paid Buckman, through Fresh Start, and Thomas, through Unique Management, $166,774 in additional charges related to the settlement of the Brock Home, for services that were duplicative and/or non existent.

192.    Buckman then paid a kickback of $10,000 to the Foxworths.

193.    As such, Superior, Access Abstract, American One, Escobar, Buckman, Fresh Start, Thomas, Cynthia Foxworth and Vincent Foxworth violated RESPA by:

    a.    Giving or accepting kickbacks or other things of value in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(c);

    b.    Giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for

services actually performed, in violation of 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

194.     Mrs. Brock was never given a copy of the HUD-1 from the purported sale of her home that would detail these payments, and the conspiracy took steps to conceal the nature of the transaction from her.

195.     Mrs. Brock never received invoices from Fresh Start, Unique or the Foxworths, nor was she given notice of the payments made to them.  In fact, prior to investigation of her counsel, Mrs. Brock had never heard of Unique.

196.     Further, Mrs. Brock believed that she was receiving a one-year term loan, and had no reason to suspect that, unbeknownst to her, Defendants were splitting fees related to a sale of her home.

197.     Mrs. Brock only became aware of these payments in October of 2009, when her counsel received closing documents from Access Abstract.

198.     Further, Defendants took numerous purposeful steps to conceal the nature of the transaction, including but not limited to, never sending Mrs. Brock the documents, repeatedly making assertions to Mrs. Brock about the fictitious "bridge loan," putting proceeds from the "loan" into an account that Hudgins controlled, in order to keep Mrs. Brock dependent on Defendants, and making false statements to law enforcement investigators.

199.     As such, the statute of limitations for RESPA should be equitably tolled.

200.     Superior, Access Abstract, Escobar, Esposito, Buckman, American One, Fresh Start, Thomas, Trinity, Unique, Vincent Foxworth and Cynthia Foxworth are

jointly and severally liable to Mrs. Brock for actual damages, trebled under 12 U.S.C. § 2607(d)(2), and for fees, costs and disbursements.

201.    Trinity Insurance is liable for claims against its co-managing member, Thomas.

202.    American One is liable for its own actions, for claims against its employee, Buckman, and its President, Esposito.

### Count VI- Negligence
### Margaret Brock v. All Defendants

203.    Plaintiffs incorporate paragraphs 1 through 203 by reference as if set forth in full herein.

204.    Pursuant to federal and state law, Access Abstract and Escobar had a duty to follow Pennsylvania law, to accurately prepare all federal disclosure forms for the transaction, including a HUD-1, to do so lawfully, and without making charges to Mrs. Brock for services that were not performed, to actually perform the duties as a settlement and title agent, rather than letting another party conduct the closing, and to consent to and affirmatively help an assortment of individuals defraud the isolated, elderly Mrs. Brock.

205.    Each Defendant had a duty not to fund or facilitate the facially obvious fraud that was perpetrated against Mrs. Brock, and a duty to follow applicable Pennsylvania and federal law at the time of the transactions.

206.    Defendants breached their above named duties, and as a direct result of that breach, Mrs. Brock suffered economic harm, including the loss of title to her home, as well as the loss of significant amounts of home equity.

## Count VII – Breach of Fiduciary Duty

**Margaret Brock v. Leona Hudgins; Danette Thomas; Byron White; Unique Management and Consulting Services, L.L.C; Trinity Insurance, Abstract and Title Agency L.L.C.; Silver Buckman; Fresh Start Financial Services; Cynthia Foxworth; Vincent Foxworth; American One Mortgage.**

207.    Plaintiffs incorporate paragraphs 1 through 207 by reference as if set forth in full herein.

208.    The relationship between the elderly Mrs. Brock and Hudgins was one of a special confidence, and as such, the parties did not deal with each other on equal terms, resulting in Mrs. Brock's dependence on, and justifiable trust in, Hudgins.

209.    Among other ways, Hudgins established a fiduciary duty with Mrs. Brock by: a thirty-year long friendship with Ms. Brock that included accepting large personal gifts from the Brocks, such as their family car when Decedent fell ill and could no longer drive;  purchasing groceries for Mrs. Brock and Decedent, when they could no longer drive, for which Hudgins was both reimbursed and compensated; advising Mrs. Brock on important financial matters; and placing herself as a co-signer on Mrs. Brock's bank account.

210.    By virtue of her respective strength and power over Mrs. Brock, Hudgins exercised undue influence on Mrs. Brock and caused her direct harm by advocating for a transaction that resulted in the loss of title of Mrs. Brock's home and the loss of hundreds of thousands of dollars in home equity and other monies.

211.    As a result of this breach, Hudgins was unjustly enriched by, at minimum, approximately $20,000, which she removed directly from Mrs. Brock's bank account.

212. As a result of this breach, Mrs. Brock suffered damages of hundreds of thousands of dollars, represented by the $372,216.59 lien against her home, as well as the loss of title of her home.

213. Thomas, Trinity, Unique Management, White, Hudgins, Buckman, Fresh Start, American One, Cynthia Foxworth and Vincent Foxworth, are liable as the result of the conspiracy and concerted tortious conduct alleged in Counts VIII and IX.

### Count VIII- Civil Conspiracy
### Margaret Brock vs. All Defendants

214. Plaintiffs incorporate paragraphs 1 through 214 by reference as if set forth in full herein.

215. This claim is made against Superior with regards to Counts III, IV and V.

216. This claim is made against Thomas, Trinity, Unique Management, White, Hudgins, Buckman, Fresh Start, American One, Esposito, Access Abstract, Escobar, Cynthia Foxworth and Vincent Foxworth, with regards to Counts III, IV, V and VII

217. An agreement to take Mrs. Brock's title and home equity through a fraudulent real estate transaction existed among the Defendants, which constituted a combination of two or more persons acting with a common purpose to do an unlawful act, resulting in actual damage to Mrs. Brock.

218. Said Defendants committed overt acts in pursuance of the common purpose as set forth above. Upon information and belief, the overt acts include, but are not limited to:

   a. Hudgins, White and Thomas suggesting to Mrs. Brock that she enter into the fictitious "bridge loan" transaction.

b. Hudgins calling her friend, Danette Thomas, after her discussion with Mrs. Brock about Mrs. Brock's financial troubles.

c. Thomas calling her frequent customer and business partner, Buckman, about the situation.

d. Hudgins, Thomas and White together entering Mrs. Brock's house to complete the transaction.

e. Buckman or Thomas preparing a Power-of-Attorney document for Decedent to sign.

f. Thomas taking the Power-of-Attorney to the Brock Home, and having Decedent sign it in his bed.

g. Buckman performing as a broker for American One Mortgage, contacting Washington Mutual to receive payoff information for Loan One, and then sending that information to Escobar.

h. Buckman and Thomas communicating about the overall fraudulent scheme, as well as the respective payments that they would each receive.

i. Buckman communicating with her parents, the Foxworths, the straw buyers of the Property, about the general scheme to take Mrs. Brock's property, and other properties in the Philadelphia area.

j. Buckman paying and the Foxworths receiving a $10,000 kickback.

k. Buckman or Thomas preparing the Agreement of Sale, which, among other things, included a false $20,000 deposit to Mrs. Brock, along with three different sales prices.

l. Thomas and White taking the Agreement of Sale to Mrs. Brock, and having her sign it.

m. Thomas or Buckman sending the Agreement of Sale to the Foxworths for their signature.

n. Escobar stating in the settlement statement that Mrs. Brock received a $20,000 deposit for the purported sale transaction, despite knowing this to be false, in his role as escrow agent.

o. Buckman or Thomas communicating in advance of the closing with Escobar, sending him Mrs. Brock's loan payoff statements, the Agreement of Sale, the POA, and invoices for services to Escobar that were obviously and facially false, on behalf of Unique Management and Fresh Start, respectively.

p. Escobar preparing a $99,256.99 check for Fresh Start, and wiring $67,517.37 to Unique Management for "professional services." He knew or was willfully blind to what was otherwise obvious: that no such services were made.

q. Hudgins coercing Mrs. Brock to change the mailing address of the Commerce account to the address of Hudgins' hair salon.

r. Escobar, upon receiving an Agreement of Sale with three different sales prices on it, apparently communicating with Buckman or Thomas about the "true" sales price of the home.

s. Superior, Escobar and Access Abstract letting Buckman and Thomas perform most of the roles of settlement and closing agents.

    t.   Superior Mortgage approving a mortgage and disbursements despite obvious markers of fraud.

    u.   Esposito using his business, American One, to broker the loan on the mortgage, and splitting those fees with Buckman.

219.    The agreement among the Defendants and each act taken by Defendants in furtherance of the agreement regarding the transactions constitutes conspiracy to commit common law fraud, deceptive acts and practices under Pennsylvania's UTPCPL, violations of RESPA, and a breach of Hudgins' fiduciary duty to Mrs. Brock.

220.    Mrs. Brock was damaged in the amount of equity that was stripped from her home, in the form of payments to Buckman/Fresh Start, Thomas/Unique Management and Escobar/Access Abstract; in the amount of fees paid to White, Thomas and Hudgins separately at closing; in the amount of fees paid to White for credit repair that was never performed; and in the amount of money that Hudgins removed from the Commerce bank account.

221.    Superior is liable for its own acts, as well as for the acts of their title, settlement and escrow agent, Escobar and Access Abstract.

### Count IX- Concerted Tortious Conduct
### Margaret Brock v. All Defendants

222.    Plaintiffs incorporate paragraphs 1 through 222 by reference as if set forth fully herein.

223.    This claim is made against Superior with regards to Counts III, IV and V.

224.    This claim is made against Thomas, Trinity, Unique Management, White, Hudgins, Buckman, Fresh Start, American One, Esposito, Access Abstract, Escobar, Cynthia Foxworth and Vincent Foxworth, with regards to Counts III, IV, V and VII.

225.    The above named defendants knowingly provided substantial assistance to the underlying scheme to take hundreds of thousands of dollars in home equity from Mrs. Brock, as well as the title to her home.

226.    Further, given his professional experience as a settlement agent, closing agent and title agent, Escobar knew or was willfully blind to the fact that the conduct of the Defendants constituted a breach of duty against Mrs. Brock.

227.    As a result of this conduct, Mrs. Brock suffered damages of the loss of her home, and hundreds of thousands of dollars in home equity and other monies.

### Count X- Action to Quiet Title
**Margaret Brock v. Cynthia Foxworth; Vincent Foxworth; Superior Home Mortgage**

228.    Plaintiffs incorporate paragraphs 1 through 228 by reference as if set forth in full herein.

229.    This Count is pled against all parties which purport to have taken a title interest in or to have placed an encumbrance against the Brock Home as a result of the above described transaction.  Those parties are Cynthia Foxworth, Vincent Foxworth and Superior Mortgage.

230.    When Mrs. Brock entered into the above described transaction, she did not intend to convey title, did not understand that she was conveying title, and title was conveyed due solely to the fraud committed upon her by Defendants.  As a result, the conveyance and all that followed from it, should be held by this court to be void *ab initio*.

231.    Mrs. Brock is the lawful owner of the Property, and seeks a declaration and adjudication of that ownership and the issuance of a Deed confirming that ownership.

## Count XI- Action to Quiet Title
### (In the Alternative)

**Margaret Brock and Alfonzo A. Brock, as Beneficiaries of the Estate of Alfonzo Brock v. Cynthia Foxworth; Vincent Foxworth; Superior Mortgage Corporation**

232.    Plaintiffs incorporate paragraphs 1 through 232 by reference as if set forth in full herein.

233.    Alfonzo A. Brock is the sole child of Margaret Brock and Decedent, Alfonzo Brock, and as such, is a beneficiary of the estate of Decedent, along with Mrs. Brock.

234.    In 2004, Decedent suffered a series of strokes that left him cognitively impaired, and unable to make legal decisions.  By 2006, Defendant was receiving end-of-life, in-home hospice care at the Brock Home, and was confined to a bed set up in the Brock dining room.

235.    In May of 2006, the Property was owned by Decedent and Mrs. Brock together, as joint tenants with right of survivorship.

236.    On September 7, 2007, Thomas came to the Brock home, and had Decedent sign a Power-of-Attorney form in his dining room bed.

237.    Mr. Brock did not have the cognitive ability to understand legal documents that he was signing at the time.  In fact, at the time of his signature, Defendant was bedridden, cognitively impaired, and incapable of understanding and legal documents, such as the POA at issue.

238.    Further, regardless of Decedent's lack of capacity, the POA was procedurally defective.

239. The POA that Decedent signed, in his Philadelphia home, was void of the notices specifically required by the Commonwealth of Pennsylvania in Power-of-Attorneys, pursuant to 20 Pa.C.S.A. § 560l. In fact, it provided zero precautionary notices whatsoever.

240. Further, the POA falsely indicated that Decedent was signing the document in New Jersey. It was notarized by Defendant Thomas, a New Jersey Notary, and included references to New Jersey statutes.

241. Due to Decedent's lack of capacity, substantial lack of conformity to Pennsylvania POA requirements, and other general indicators of fraud, the POA that Decedent signed is fatally defective.

242. Because the POA that Decedent signed is fatally defective, Mrs. Brock did not have the ability to act as his attorney-in-fact to sell the Property.

243. Therefore, even assuming, *arguendo*, that Mrs. Brock in fact sold her interest in her Property in October, 2007, Decedent did not.

244. As such, as Joint Tenants, upon the theoretical sale of the Property by Mrs. Brock, Decedent's one-half ownership stake of the Brock home was not sold, but instead was severed from that of his wife, resulting in a Tenancy in Common with Decedent and the Foxworths.

245. Assuming, *arguendo*, that Mrs. Brock sold her home, Plaintiff Mr. Brock, as a representative of his father's estate, seeks a declaration from this Court that his father did not legally sell his property interest, and as such, the estate is owner of one-half of the Property at 1611 Swain Street, free and clear of any encumbrances made by Vincent and Cynthia Foxworth and Superior Mortgage.

**WHEREFORE,** Plaintiff Margaret Brock seeks judgment against Defendants for threefold the damages suffered by her, punitive damages where appropriate, together with costs of this action and reasonable attorney's fees.

Further, Mrs. Brock seeks A) an Order declaring and adjudging that the deed dated October 19, 2007, and recorded at Philadelphia, Pennsylvania, on October 24, 2007, as Document ID No. 51797035, purportedly transferring to Defendant title to the real property located at 1611 Swain Street, Philadelphia, PA, 19130, is void *ab initio* and cancelled of record;  B) For said Order to declare and adjudge that Plaintiff, Margaret Brock, owns the Property absolutely and in fee, clear of any encumbrances, and is entitled to the quiet and peaceful possession of the Property; that Defendants and all persons claiming under them have no estate, right, title, lien, or interest in or to said Property; and that title to the Property be quieted in the name of Plaintiff, Margaret Brock, against all claims of Defendant and all persons claiming under him;  and C) For said Order to direct the Commissioner of the Department of Records of Philadelphia County to record a Deed of Confirmation, with the Court's Order attached, acknowledging Plaintiff, Margaret Brock, as owner of the real property located at 1611 Swain Street, Philadelphia, PA, 19130.

Dated:  June 23, 2010                     ___/s/ Daniel Urevick-Ackelsberg___
              `
                                        Daniel Urevick-Ackelsberg, Esquire
                                        Pennsylvania ID No. 307758
                                        Elizabeth Goodell, Esquire
                                        Montgomery L. Wilson, Esquire
                                        COMMUNITY LEGAL SERVICES, INC.
                                        3638 N. Broad Street
                                        Philadelphia, PA 19140
                                        Tel: (215) 227-2400
                                        dackelsberg@clsphila.org
                                        Attorneys for the Plaintiffs