## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSLYVANIA

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, assignee of MARGARET BROCK; and ALFONSO A. BROCK <br><br> Plaintiffs, <br><br> v. <br><br> DANETTE THOMAS, et al., <br><br> Defendants. | CIVIL ACTION NO.: 2:10-CV-00687 |

## BRIEF IN SUPPORT OF
## CHICAGO TITLE INSURANCE COMPANY'S
## MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS
## DANETTE THOMAS, LEONA HUDGINS, BYRON WHITE, AND SILVER BUCKMAN

**I.**   **INTRODUCTION**

Movant herein is Chicago Title Insurance Company ("Chicago Title"), in its capacity as assignee of the claims pled by Plaintiff Margaret Brock ("Mrs. Brock").  Respondents herein are Defendants Danette Thomas ("Thomas"), Leona Hudgins ("Hudgins"), Byron White ("White"), and Silver Buckman ("Buckman") (collectively, the "Respondents").  Pursuant to a settlement agreement between and among Plaintiffs and certain Defendants and/or their insurance companies, Plaintiff Margaret Brock has agreed to assign her rights and claims as set forth in the First Amended Complaint to Movant Chicago Title.  A duly executed Assignment of Rights has been docketed with the Court.

The Respondents to this Motion were part of an enterprise that was formed to defraud homeowners facing foreclosure or otherwise struggling financially, by convincing them to convey their homes to the Enterprise under the guise of entering into purported one-year credit transactions to save their homes.  In the course of these transactions, the enterprise obtained

financing for the disguised purchases, and then uses the proceeds of the loans—essentially stolen equity—to funnel payments to an array of associated individuals and shell companies.  The victims of the scheme were generally told that their equity was simply going into "escrow," and that during the one year period of their "loan," the mortgage on the property would be paid by the enterprise.  In fact, in each case, the enterprise simply took most of the money, leaving the assorted victims in homes that were no longer in their names, with large unaffordable mortgages that were also not in their name, usually in foreclosure, and with all of their remaining equity having evaporated.

In this case, the Respondents arranged for a loan from Superior Mortgage Corporation in the amount of $342,000, even though Mrs. Brock only owed about $80,000 on her existing mortgage prior to becoming acquainted with the members of the enterprise.  The mortgage executed by the straw buyers (Buckman's parents) to secure the loan was insured by Chicago Title Insurance Company ("Chicago Title"), Movant herein.

## II.   FACTS RELEVANT TO MOTION

Mrs. Brock grew up in the home at 1611 Swain Street, Philadelphia, Pennsylvania 19130 (the "Property"), and came to be its owner.  *Reference* Deposition of Mrs. Brock.  Mrs. Brock Dep. 12:7-10, June 20, 2011.  In May 2006, Mrs. Brock's mother, Clara Benton, passed away and, shortly thereafter Mrs. Brock's husband became very ill.  Mrs. Brock Dep. 26:21-22.  To pay for all the medical bills and necessary house repairs, Mrs. Brock thought she needed a loan.  Mrs. Brock Dep. 20:2-5.  Mrs. Brock confided in Respondent Hudgins that she was experiencing financial difficulties.  Hudgins explained to Mrs. Brock that Respondent  White was "going into another endeavor with mortgages" and put Mrs. Brock and White in contact to refinance the Property.  *Reference* Deposition of Hudgins.  Hudgins Dep. 26:9-14, June 10, 2011.

Mrs. Brock trusted both Hudgins and White.  Hudgins and Mrs. Brock were so close, "[t]hey were like sisters" and White, who referred to Mrs. Brock as "Aunty Margaret," was just a small child when they met.  *Reference* Deposition of White.  White Dep. 20:2-6, 22:5, June 10, 2011, Hudgins Dep. 16:10, 25:21-23, *and* Mrs. Brock Dep. 24:21-24;  *See also* White Answer at ¶40.  In the fall of 2006, based on the information received from Hudgins, White went to the Property offering financial assistance.  White told Mrs. Brock that she "may have to refinance her current loan in order to acquire the funds she needed."  Mrs. Brock Dep. 26:3-9, White Dep. 35:7-14, *and* White Answer at ¶42-¶43.  White, however, never took any licensing or certification exams related to the mortgage business and is not a Pennsylvania licensed mortgage originator.  White Dep. 16:3-6; *See also* White Answer at ¶47.  White contacted his friend and mentor in the mortgage business, Alim Wallace, at American One Mortgage, for assistance with Mrs. Brock's refinance transaction.  Under White's "guidance," Mrs. Brock refinanced with an adjustable rate note in the amount of $120,000 secured by a mortgage given to WMC Mortgage Corp. recorded with the City of Philadelphia at Document ID 51598958.  Regrettably, the terms of the loan were unfavorable and unmanageable for Mrs. Brock.  White Dep. 35:22-24, White Answer at ¶45, *and* Mrs. Brock Dep. 105:3-13.  Mrs. Brock paid White $1,500.00 for helping with the refinance transaction.  White Dep. 37:3-8, Mrs. Brock Dep. 114:2-5.

In early 2007, White again heard that Mrs. Brock was experiencing financial troubles through his mother, Hudgins.  White Dep. 41:20-42:4.  Hudgins Dep. 34:9-10, 40:17-21. Hudgins and White, Thomas, and Buckman all knew each other prior to Mrs. Brock.  White contacted Thomas, who in turn contacted Buckman.  Thomas knew Buckman as a client of hers while at Trinity.  She also previously met Hudgins and Ms. Foxworth at closings at Trinity. Hudgins contacted Thomas to possibly assist Mrs. Brock in refinancing.  White Dep. 17:18-23,

13:12-16, 52:3-5, *Reference* Deposition of Thomas.  Thomas Dep. 32:20-21, 33:22-34:2, 38:25, June 8, 2011, Hudgins Dep. 35:18-23, Hudgins Answer at ¶52.  White and Thomas went to the Property in September of 2007 to discuss Mrs. Brock's financial situation after the 2006 refinance transaction. Thomas Dep. 44:3-10.  Neither Thomas, nor her title agency, was authorized to conduct closings in the Commonwealth of Pennsylvania.  Thomas Answer at ¶126.  White explained to Mrs. Brock that she may not be able to refinance because of her poor credit, which White offered to repair.  Thomas Dep. 54:21-25, White Dep. 109:16-18.  Mrs. Brock paid White $1,300 and $3,900 to for his services to repair Mrs. Brock's credit, and for doing work around Mrs. Brock's house.  White Dep. 110:21-111:6; *See also* White Answer at ¶116.

Mrs. Brock expressed her desire to continue to live at the Property, and so Thomas and White enlisted Buckman to propose a "buyback program" instead of having Mrs. Brock refinance again.  Thomas Dep. 55:9-12, 60:10-11, 61:8-62:3, Buckman Answer at ¶162.  *Reference* Deposition of Buckman.  Buckman Dep. 130:10-13, August 13, 2011.  The buyback program was offered by Buckman through Fresh Start, an LLC Buckman created for the sole purpose of draining equity from people's homes under the guise of helping them get back on their feet.  Buckman recruited her parents, the Foxworths, to be the straw buyers or "investors" on the Property.  Buckman Answer at ¶54 and ¶98.  White Dep. 55:9-11, 56:22-57:3.  Buckman paid the Foxworths, her parents, $10,000 for their "services" in "investing" in the Property.  Buckman Answer at ¶192.  To convince Mrs. Brock to go along with the scheme, she was told that she would be "selling" her house for over $400,000, financed with a $342,000, and that, somehow, she would be able to buy it back after a year by paying off the new gigantic mortgage.  Mrs. Brock Dep. 68:15-16.  Buckman prepared the Agreement of Sale and gave it to Thomas and White.  White told Mrs. Brock to sign, and she did.  Buckman Answer at ¶73, White Dep. 65:24-

66:5, 77:17-20, 85:22-86:2, Thomas Dep. 63:8-12, Mrs. Brock 77:13-20.  A true and correct copy of the Agreement of Sale is attached hereto as Exhibit "J."

Throughout the sale transaction, Mrs. Brock was under the impression that she would sell her house to the Foxworths for one year, and would continue to live there while the Foxworths, through Buckman, would pay the mortgage.  Mrs. Brock was told she needed to continue to pay the bills and maintain the upkeep, and then, when the one year expired, she would get the house back and resume paying her original mortgage. Mrs. Brock Dep. 71:19-21, 42:19-43:4, 44:2-9.  Closing took place at the Property on October 19, 2007, while Mrs. Brock's sick husband reclined in bed in the dining room.  Mrs. Brock signed the Deed to Ms. Foxworth and executed the HUD-1 Settlement Statement.  Mrs. Brock, Buckman, and Thomas sat at the kitchen table, with White standing behind Mrs. Brock.  Buckman Answer at ¶86. Buckman Dep. 127:17-23, Mrs. Brock Dep. 84:8-18, 59:2-25, 60:19-22.  A true and correct copy of the HUD-1 Settlement Statement is attached hereto as Exhibit "K" and a copy of the Deed is recorded with the City of Philadelphia at Document ID 51797035.  Buckman reviewed the buyback program with Mrs. Brock at the closing and advised her that she would be able to purchase the home back after a year.  Buckman Answer at ¶171a-d,  Buckman Dep. 131:7-12.  Buckman told Mrs. Brock that in order to buyback the house she would have to pay off the mortgage executed by the straw buyers by obtaining financing to do so from yet another lender.  Buckman Dep. 131:16-24, 132:20-23.  Mrs. Brock, however, did not know that Ms. Foxworth was taking out a loan in the amount of $342,000.  Mrs. Brock Dep. 73:6-12.

According to the HUD, the proceeds of the loan were distributed as follows: $99,256.99 to Buckman (through Fresh Start), $67,517.37 to Thomas (through Unique Management), $127,900.95 to Washington Mutual to pay off the unfavorable 2006 loan brokered illegally by

White, and $49,999.90 to Mrs. Brock. *Reference* HUD-1 Settlement Statement, attached hereto as Exhibit "K."

### Facts Pertaining to Defendant Danette Thomas and Byron White

According to Thomas, she and Mrs. Brock discussed the idea of Thomas working for Mrs. Brock performing various services such as paying Mrs. Brock's bills and taking Mrs. Brock places.   Thomas said that she was to be paid $65,000 *up front*, to act as her caretaker for the period of five (5) years.  Nothing to this effect is in writing.  White Dep. 90:12-91:24; Thomas Dep. 95:4, 96:6-13, 85:2-12, 92:8-21.  To collect the up-front money for these caretaker services, Thomas prepared an invoice under Unique Management and gave the invoice to Buckman. Naturally, Thomas did not give Mrs. Brock a copy of the invoice.  Thomas Dep. 86:9-12, 98:12-14, 24, 99:12-13.  Thomas came to Mrs. Brock's home once after the closing transaction with a book and went over Mrs. Brock's bills to make a "bill schedule" for Thomas to come in every month and write out Mrs. Brock's bills.  Thomas did not actually provide any services to Mrs. Brock, but rather went over information that Mrs. Brock already knew. Thomas Dep. 105:21-106:3, Mrs. Brock Dep.  46:19-47:3.  Thomas never provided Mrs. Brock with any other kind of assistance.  Mrs. Brock Dep. 47:7-9.

As far as Thomas was concerned, she was entitled to all the money she received at closing because Mrs. Brock was "the one who decided not to continue with the relationship." Thomas Dep. 110:2-4.  A total of $67,517.37 was wired to Thomas by the agent which closed the sale transaction.   The account set up by Thomas to receive the money was promptly closed, and Thomas never returned any of it despite her admission that she never performed any caretaking or other services for the benefit of Mrs. Brock.  Thomas Dep. 112:11-18.  When asked what she did with the $67,517.37 that she received, Thomas testified "I spent it."  Thomas Dep.

100:20-22.  When asked what she spent it on, she explained that used the money to pay her own personal expenses including "gas," "car payments," "car insurance" and "electric bills."  Thomas Dep. 101:7-15.  When asked to explain why she used money that she claimed was for the benenfit of Mrs. Brock to pay her own personal expenses, she testified that "it was a way to make up for a lack of income for me to live."  Thomas Dep. 102:3-8.  White, Thomas's husband, brokered the first unfavorable loan, without a license, which was paid off when the Respondents tricked Mrs. Brock into selling her home to Buckman's parents.  White told Mrs. Brock that the financing for the buyback loan would be arranged through the company that he was starting.  White Answer, ¶¶ 57-59.  White received $1,500 from Mrs. Brock for brokering that first unfavorable loan.  White Dep. 37:2-3.

White remained heavily involved with the scheme to take Mrs. Brock's money during the subsequent buyback transaction.  In fact, he provided Buckman with Mrs. Brock's phone number, which marked the beginning of the process of tricking Mrs. Brock into selling her home and draining its remaining equity through payments to the Respondents.  White Dep. 54:5-7.  During the closing on the sale of her house, White was the one who explained to Mrs. Brock that she would be temporarily selling her home to Buckman's parents.  White Dep. 55:19 through 60:13.  White was fully aware that his then-girlfriend Thomas was receiving about $68,000 from the proceeds of the sale of Mrs. Brock's Property, which was allegedly an up-front payment for services Thomas never actually performed.  White Dep. 90:3-93:3.  White received $500 in cash from Mrs. Brock after the closing on the sale was complete.  White Dep. 107:7-22.

## Facts Pertaining to Defendant Leona Hudgins

Mrs. Brock was told by White and Hudgins that she would receive a $40,000, one-year loan, that she would continue living in her home, and that at the end of one year, she would

refinance the transaction.  Mrs. Brock told Hudgins that she didn't understand the terms of the transaction, but Hudgins told her not to worry, because she herself had received a "bridge loan" before, and that it had worked out well.  Hudgins told Mrs. Brock to "just stay well," and that at the end of 12 months, the transaction would be refinanced, and the Property would be returned to Mrs. Brock without any encumbrances.  Mrs. Brock was still confused about the terms of the transaction, but relied on the continued and regular assertions from Thomas, White and Hudgins that after a year, the loan would come due, and she would retake all rights to her home.  Hudgins Answer, at ¶¶ 61-64.

In October of 2007, Hudgins opened a joint account titled to herself and Mrs. Brock at a Commerce Bank branch in New Jersey.  Mrs. Brock Dep. 57:7-22; Hudgins Answer, at ¶109.  After the sale transaction, Hudgins changed the mailing address of the joint bank account to 1415 Fitzwater St., Philadelphia, PA 19146, Hudgins' salon address.  Hudgins Answer, at ¶114.  Over the course of the next eighteen months, Hudgins used her signing power on the account and withdrew approximately $20,000 dollars of the money sent to this account on behalf of Mrs. Brock.  Id. at ¶ 115.  Hudgins also convinced Mrs. Brock to pay an additional $5,200 to White so could help repair her credit.  Id. at ¶ 116.  According to the banks records, in October of 2009, Hudgins closed the joint the account.

### Facts Pertaining to Defendant Silver Buckman

Buckman owned and operated Fresh Start.  Buckman Answer at ¶22.  Buckman's primary business are "buyback" programs, where an investor would "purchase" a home in order to save a homeowner from going into foreclosure.  Buckman Answer at ¶23.  Buckman prepared the Agreement of Sale for the Property.  Buckman Answer at ¶73.  The $20,000 deposit paid by the Foxworths was not received by Mrs. Brock.  Buckman Answer at ¶77.  On or about October

23, 2007, Buckman deposited the check for $99,256.99 made out to Fresh Start Financial

Services.  Buckman Answer at ¶95-97.  The $99,256.99 was supposed to be placed in an escrow

account because it was needed to pay the new mortgage taken out by Buckman's parents.

However, Fresh Start put the money into the operating account of Fresh Start, and of course it is

all gone now.  Buckman Dep. 136:4-14.  Buckman claims that Fresh Start was paid a maximum

amount of $5,000 in profit out of the $99,256.99, but Buckman also received a commission as a

result of this transaction from America One.  Buckman Answer at ¶108, Buckman Dep. 136:15-

21, 137:2-13.  Fresh Start paid $24,077.00 to her mother out of the $99,256.99.  Buckman Dep.

147:8-11, 148:17-23.

Fresh Start was supposed to make the mortgage payments.  According to Buckman, Fresh

Start did make "some" payments on the mortgage, but the mortgage went into default almost

immediately because Buckman had no interest in sending any money to Superior Mortgage when

she could just keep it for herself.  Buckman Dep. 139:16-22.  Mrs. Brock first became aware that

the mortgage was not being paid when Mrs. Brock asked Hudgins "when is the property going to

be turned back over to me, so I can do what I'm supposed to do in taking over the property that

I've been in all my life?"  Hudgins answered that Buckman was having trouble with the money.

Mrs. Brock Dep. 81:9-19.  Buckman admits that the mortgage on the Property was not paid for

the twelve (12) months as promised.  Buckman Dep. 141:10-15.  Fresh Start had an issue, where

all the accounts they held, merged into one big account.  The negligence of Fresh Start by not

holding the $99,256.99 in a separate escrow account is the fault of Fresh Start and not the fault of

Mrs. Brock, as Buckman was forced to concede.  Buckman Dep. 141:15-19, Buckman Dep.

141:21-23.  In fact, Buckman admits that Mrs. Brock has a right to be "disappointed" with

Buckman as a result of her failure to pay the mortgage—not to mention her outright theft of much of the equity in the Property.  Buckman Dep. 149:15-17.


## III.   QUESTION PRESENTED

Is Movant, in its capacity as assignee of Plaintiff Margaret Brock's claims, entitled to summary judgment on the claims against Respondents for breach of contract, breach of fiduciary duty, civil conspiracy and violation of the federal Racketeer Influenced and Corruption Act? Suggested answer:      Yes.  In view of the admissions of Respondents, together with the record documents including the HUD-1 Settlement Statement, there are no factual issues precluding summary judgment on each of these claims.


## IV.   ARGUMENT

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The Supreme Court has stated that:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Issues of fact are genuine "only if a reasonably [factfinder], considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988) (citations omitted). Material facts are those which will affect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the evidence or make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393. If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a verdict in its favor. Id.

### A.  There Are No Genuine Issues of Material Fact Precluding Summary Judgment Against Defendant Thomas

Under Pennsylvania law, a breach of contract is a nonperformance of any contractual duty of immediate performance, or the violation of an obligation, engagement, or duty. Johnson v. Fenestra, Inc., 305 F.2d 179 (3d Cir. 1962); Camenisch v. Allen, 158 Pa. Super. 174, 44 A.2d 309 (1945).

In this case, according to Thomas, she agreed to receive money from the equity of Mrs. Brock's lifelong home and to use that money to take care of Mrs. Brock. The amount received by Thomas was $67,517.37. Thomas did not spend this money taking care of Mrs. Brock, in breach of the terms of the agreement alleged by Thomas. In fact, as set forth above, Thomas

spent all of the money to cover her own personal expenses because, according to her, she did not have any other income to live on.  Thomas's actions constitute a breach of her contractual obligation to Mrs. Brock, giving rise damages in the principal amount of $67,517.37.

In order to establish a claim for breach of fiduciary duty under Pennsylvania law, a party must demonstrate: (1) the existence of a confidential relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused by the defendant's failure to act.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006).  A fiduciary duty exists when there is a "special relationship," which is one "involving confidentiality, the  repose of special trust or fiduciary responsibilities." eToll, Inc., v. Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10, 22 (Pa. Super. 2002). A confidential relationship "generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other."  Id.

In this case, upon taking possession of proceeds from the equity in Mrs. Brock's home, Thomas undertook a fiduciary obligation to hold and use that money for the sole benefit of Mrs. Brock.  Thomas breached that duty upon spending all of the money for her own personal benefit. Thomas's breach of fiduciary duty has given rise to damages in the principal amount of $67,517.37.  A breach of fiduciary duty also gives rise to punitive damages, which can be awarded at the discretion of the Court.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff Margaret Brock's claims, requests an order entering judgment in its favor and against Thomas in the principal amount of $67,517.37, together with legal interest at the per diem rate of $11.09

12

dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest,

punitive damages, and taxable costs.

### B.    There Are No Genuine Issues of Material Fact Precluding Summary Judgment Against Defendant White

In order to establish a claim for breach of fiduciary duty under Pennsylvania law, a party

must demonstrate: (1) the existence of a confidential relationship; (2) the defendant's failure to

act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope

of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused

by the defendant's failure to act.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392,

414-15 (E.D. Pa. 2006).  A fiduciary duty exists when there is a "special relationship," which is

one "involving confidentiality, the  repose of special trust or fiduciary responsibilities." eToll,

Inc., v. Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10, 22 (Pa. Super. 2002).

A confidential relationship "generally involves a situation where by virtue of the respective

strength and weakness of the parties, one has the power to take advantage of or exercise undue

influence over the other." Id.

In this case, Respondent White operated at all times as the liaison between Mrs. Brock

and Buckman, the person who engineered the fraudulent sale of the Property.  White, the son of

Mrs. Brock's former best friend (Hudgins), engaged Mrs. Brock in a relationship premised upon

confidence and trust.  After illegally brokering an unfavorable refinance loan for Mrs. Brock in

2006, White once again took the lead with roping Mrs. Brock back into to yet another, even more

bold, scheme whereby Mrs. Brock surrendered title to her Property with no chance whatsoever to

"buy it back."  White exploited not only his mother's phony relationship with Mrs. Brock, but in

an even more troubling manner, he also exploited Mrs. Brock's desperation to pay for her ailing husband's medical care.

White's breach of fiduciary duty was the linchpin holding together the entire enterprise. White not only recruited Buckman to arrange for the absurd sale of the Property to straw buyers, but he saw to it that his girlfriend (and current wife) received $67,517.37 from the proceeds of the sale. Whether or not White enjoyed the benefit of the proceeds wired to his wife's bank account, White's multi-faceted fiduciary breaches give rise to damages in amount equal to, if not greater than, the proceeds received by his wife as a direct result of his conduct. In addition, White may be held liable for punitive damages at the discretion of the Court.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff Margaret Brock's claims, requests an order entering judgment in its favor and against White in the principal amount of $67,517.37, together with legal interest at the per diem rate of $11.09 dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest, punitive damages, and taxable costs.

### C.  There Are No Genuine Issues of Material Fact Precluding Summary Judgment Against Defendant Hudgins

In order to establish a claim for breach of fiduciary duty under Pennsylvania law, a party must demonstrate: (1) the existence of a confidential relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused by the defendant's failure to act. Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006). A fiduciary duty exists when there is a "special relationship," which is one "involving confidentiality, the repose of special trust or fiduciary responsibilities." eToll,

14

Inc., v. Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10, 22 (Pa. Super. 2002). A confidential relationship "generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other." Id.

In this case, Respondent Hudgins, much like her son, engaged Mrs. Brock in a relationship premised upon confidence and trust.  A lifelong friend of Mrs. Brock, Hudgins was well-positioned to help the more active members of the enterprise accomplish their fraudulent and criminal scheme.  Hudgins personally benefited from the funds that she placed into a joint account titled to herself and Mrs. Brock.  Hudgins has failed to account for $20,000.00 that was withdrawn by her prior to closing the account.  Hudgins's apparent theft of this money, together with her assistance in tricking Mrs. Brock to sell her house, gives rise to a breach of fiduciary duty.  Hudgins also breached her fiduciary duty to Mrs. Brock by convincing to pay $5,200 for credit repair services that were never performed by Hudgins or White.  In addition to the $25,200 liability, the Court has the discretion to award punitive damages.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff Margaret Brock's claims, requests an order entering judgment in its favor and against Hudgins in the principal amount of $25,200, together with legal interest at the per diem rate of $3.28 dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest, punitive damages, and taxable costs.

### D.      There Are No Genuine Issues of Material Fact Precluding Summary Judgment Against Defendant Buckman

Under Pennsylvania law, a breach of contract is a nonperformance of any contractual duty of immediate performance, or the violation of an obligation, engagement, or duty.  Johnson

v. Fenestra, Inc., 305 F.2d 179 (3d Cir. 1962); Camenisch v. Allen, 158 Pa. Super. 174, 44 A.2d
309 (1945).

In this case, according to Buckman, she agreed to received proceeds from the equity of
Mrs. Brock's home that were supposed to be used to pay the mortgage executed by her parents
against the Property.  As admitted by Buckman, she failed to pay the monthly mortgage amounts,
and the loan went into default almost immediately after the closing.  Buckman apparently
decided it was better to keep all of the proceeds for herself rather than pay a mortgage on a
Property that her parents, mere straw buyers, had no interest in.  Buckman siphoned an
astounding $99,256.99 from the equity in Mrs. Brock's home through a wire transfer straight to
her bank account—i.e., not an escrow account for the benefit of Mrs. Brock.  Buckman has
testified that all of that money is now gone, though none of it was spent for the benefit of Mrs.
Brock, whose home went into foreclosure as quickly as Buckman disappeared with her money.
To the extent Buckman's testimony is credited, an agreement was reached for her to receive
these proceeds for the purpose of paying the mortgage against Mrs. Brock's home.  That
agreement was breached as a result of Buckman's failure to make the mortgage payments and
because Buckman has not returned any of the money to Mrs. Brock.

In order to establish a claim for breach of fiduciary duty under Pennsylvania law, a party
must demonstrate: (1) the existence of a confidential relationship; (2) the defendant's failure to
act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope
of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused
by the defendant's failure to act.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392,
414-15 (E.D. Pa. 2006).  A fiduciary duty exists when there is a "special relationship," which is
one "involving confidentiality, the  repose of special trust or fiduciary responsibilities." eToll,

Inc., v. Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10, 22 (Pa. Super. 2002).
A confidential relationship "generally involves a situation where by virtue of the respective
strength and weakness of the parties, one has the power to take advantage of or exercise undue
influence over the other." Id.

In this case, according to Buckman, she agreed to hold in trust certain proceeds she
received from the equity in Mrs. Brock's home in connection with the sale of the Property to
Buckman's parents. Buckman was supposed to use that money to pay the mortgage her parents
executed. Buckman admittedly failed to pay the mortgage, but instead used the money to
continue to run her criminal enterprise and for her own personal benefit. As a result, Buckman
breached her fiduciary duty owed to Mrs. Brock to hold and use the money for Mrs. Brock's
benefit. Buckman's breach has given rise to damages in the principal amount of the proceeds
Buckman received from the sale—i.e. the wire transfer of $99,256.99. In addition, the Court has
the discretion to award punitive damages.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff
Margaret Brock's claims, requests an order entering judgment in its favor and against Buckman
in the principal amount of $99,256.99, together with legal interest at the per diem rate of $16.31
dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest,
punitive damages, and taxable costs.

### E.    There Are No Genuine Issues of Fact Precluding Summary Judgment Against All Respondents for Civil Conspiracy

Under Pennsylvania law, a civil conspiracy has been defined as a combination between
two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or
unlawful means; or, variously, as a combination between two or more persons by some concerted

action to accomplish an unlawful purpose.  Civil conspiracy also requires an overt act done in pursuance of the common purpose; and actual legal damage. Proof of malice or intent to injure is essential to the proof of a conspiracy.  Ryan v. Lower Merion Twp., 205 F. Supp. 2d 434 (E.D. Pa. 2002); Strickland v. University of Scranton, 700 A.2d 979 (Pa. Super. Ct. 1997).

In this case, as described above, the Respondents conspired to steal the equity in Mrs. Brock's home through a sham transaction designed solely to enrich Respondents to the detriment of Mrs. Brock and her family.  The conspiracy engineered by Respondents constituted a combination of two or more persons acting with a common purpose to do an unlawful act, resulting in actual damage to Mrs. Brock.  Respondents committed overt acts in pursuance of the common purpose as set forth above.  These acts included:

      a.  Hudgins, White and Thomas suggesting to Mrs. Brock that she enter into the fictitious "bridge loan" transaction.

      b.  Hudgins calling her friend, Thomas, after her discussion with Mrs. Brock about Mrs. Brock's financial troubles.

      c.  Thomas calling her frequent customer and business partner, Buckman, about the situation.

      d.  Hudgins, Thomas and White together entering Mrs. Brock's house to complete the transaction.

      e.  Buckman and Thomas communicating about the overall fraudulent scheme, as well as the respective payments that they would each receive.

      f.  Buckman communicating with her parents, the Foxworths, the straw buyers of the Property, about the general scheme to take Mrs. Brock's property.

     g.  Buckman or Thomas preparing the Agreement of Sale, which, among other things, included a false $20,000 deposit to Mrs. Brock, along with three different sales prices.

     h.  Thomas and White taking the Agreement of Sale to Mrs. Brock, and having her sign it.

     i.  Buckman or Thomas communicating in advance of the closing with the title agent, sending him Mrs. Brock's loan payoff statements, the Agreement of Sale, and invoices for services never rendered on behalf of Mrs. Brock.

     j.  Hudgins coercing Mrs. Brock to change the mailing address of the Commerce Bank account to the address of Hudgins' hair salon.

The agreement among the Respondents and each act taken by Respondents in furtherance of the agreement regarding the transactions constitutes conspiracy to commit common law fraud, violations of RICO, and a breach of their respective fiduciary duties to Mrs. Brock. Respondents are each liable for the sum total of the liability of individual actor. The principal amount of damages suffered by Mrs. Brock includes the total amounts siphoned from the equity in her Property. The sum of the amounts taken by Respondents in connection with the 2007 sale transaction, as described above and as reflected on the HUD, is $186,774.36.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff Margaret Brock's claims, requests an order entering judgment in its favor and against Thomas, White, Hudgins and Buckman, jointly and severally, in the principal amount of $186,774.36, together with legal interest at the per diem rate of $30.69 dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest, punitive damages, and taxable costs.

**F.     There Are No Genuine Issues of Fact Precluding Summary Judgment
Against All Respondents for Violation of 18 U.S.C. § 1962(c) and (d)**

The Respondents herein were willing participants in an "enterprise" and an "association-in-fact" as defined by the federal Racketeer Influenced and Corruptions Act, 18 U.S.C. §1961(4) (hereinafter the "Enterprise").  Each of the Respondents acted as a "person" as defined under the statute.  The Enterprise had as its common purpose a scheme to defraud financially distressed homeowners, including Mrs. Brock, out of the title to, and equity in, their homes.  The Enterprise began as early as 2006 and has acquired at least thirteen separate deeds in its scheme, generally employing as its core misrepresentations that that conveyances are intended to be temporary transfers connected to debt repair services and loan transactions to be provided to the victims. The Enterprise is engaged in activities which affect interstate commerce in that it is a New Jersey set of actors that conspired to take title and equity from homeowners in both New Jersey and Pennsylvania, and that it used a series of state and national mortgage companies to fund the scheme.

The conduct described above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).  The conduct of the Respondents constituted the execution of a multi-year, ongoing scheme to obtain money and property by means of fraudulent pretenses and representations through the use of interstate wire communication, in violation of 18 U.S.C. § 1343.  Their use of the interstate wire system included (a) interstate faxes sent to homeowner-victims and interstate faxes received from mortgage companies for payoff statements, including a loan payoff statement for Mrs. Brock's mortgage, apparently solicited by, and then faxed to Buckman in October of 2007; (b) wiring of settlement proceeds to out-of-state accounts.

The conduct described above constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).  The Respondents participated in the affairs of the Enterprise through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §1961(5), more specifically, through a pattern of mail and wire fraud, as described above.  Mrs. Brock was an intended target of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Defendants. The financial harm suffered by Mrs. Brock was by reason of said conduct and was the direct result of such conduct.

Pursuant to 18 U.S.C. § 1964(c), Respondents are each liable for treble damages, together with reasonable attorney's fees and costs.  The principal amount of damages suffered by Mrs. Brock includes the total amounts siphoned from the equity in her Property.  The sum of the amounts taken by Respondents in connection with the 2007 sale transaction, as described above and as reflected on the HUD, is $186,774.36.  Accordingly, Respondents are liable for treble damages totaling $560,323.08.

In sum, Chicago Title Insurance Company, in its capacity as assignee of Plaintiff Margaret Brock's claims, requests an order entering judgment in its favor and against Thomas, White, Hudgins and Buckman, jointly and severally, in the principal amount of $560,323.08, together with legal interest at the per diem rate of $92.06 dating from October 19, 2007 to the date of entry of judgment, plus post-judgment interest, punitive damages, and taxable costs.

V.    **RELIEF**

Movant Chicago Title Insurance Company, assignee of Plaintiff Margaret Brock's claims, respectfully requests the entry of judgment against each Respondent and the issuance of an Order effectuating the entry of such judgment in the form proposed herewith.

Respectfully submitted,

HALBERSTADT CURLEY LLC

By: _____
Scott M. Rothman, Esq. [Penn. SBN: 201478]
1100 E. Hector St., Suite 425
Conshohocken, PA 19428
Telephone:    (610) 834-8819
Facsimile:    (610) 834-8813
Email:        srothman@halcur.com
Attorney for Movant Chicago Title Ins. Co.,
assignee of Plaintiff Margaret Brock