IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARGARET BROCK and ALFONSO A. BROCK,<br><br>    Plaintiffs,<br><br> v.<br><br>DANETTE THOMAS, et al.,<br><br>    Defendants. | CIVIL ACTION NO. 10-687 |

### CHICAGO TITLE INSURANCE'S PRE-TRIAL STATEMENT

**I. NATURE OF THE ACTION**

This matter is an action for breach of contract, breach of fiduciary duty, civil conspiracy and violation of the federal Racketeer Influenced and Corruption Act. Pursuant to a settlement agreement between and among Plaintiffs and certain Defendants and/or their insurance companies, Plaintiff Margaret Brock has agreed to assign her rights and claims as set forth in the First Amended Complaint to Chicago Title Insurance Company (Doc. No.182).

Defendants Danette Thomas ("Thomas"), Leona Hudgins ("Hudgins"), Byron White ("White"), and Silver Buckman ("Buckman") (collectively, the "Defendants") were part of an enterprise that was formed to defraud homeowners facing foreclosure or otherwise struggling financially, by convincing them to convey their homes to the Enterprise under the guise of entering into purported one-year credit transactions to save their homes. In the course of these transactions, the enterprise obtained financing for the disguised purchases, and then used the proceeds of the loans—essentially stolen equity—to funnel payments to an array of associated individuals and shell companies. The victims of the scheme were generally told that their equity was simply going into "escrow," and that during the one year period of their "loan," the

mortgage on the property would be paid by the enterprise. In fact, in each case, the enterprise simply took most of the money, leaving the assorted victims in homes that were no longer in their names, with large unaffordable mortgages that also were not in their name, usually in foreclosure, and with all of their remaining equity having evaporated.

In this case, Defendants arranged for a loan from Superior Mortgage Corporation in the amount of $342,000, even though Mrs. Brock only owed about $80,000 on her existing mortgage prior to becoming acquainted with the members of the enterprise. The mortgage executed by the straw buyers (Buckman's parents) to secure the loan was insured by Chicago Title Insurance Company ("Chicago Title").

## II.   FACTS OF THE CASE

Mrs. Brock grew up in the home at 1611 Swain Street, Philadelphia, Pennsylvania 19130 (the "Property"), and came to be its owner. In May 2006, Mrs. Brock's mother, Clara Benton, passed away and, shortly thereafter Mrs. Brock's husband became very ill. To pay for all the medical bills and necessary house repairs, Mrs. Brock thought she needed a loan. Mrs. Brock confided in Hudgins that she was experiencing financial difficulties. Hudgins explained to Mrs. Brock that White was "going into another endeavor with mortgages" and put Mrs. Brock and White in contact to refinance the Property.

Mrs. Brock trusted both Hudgins and White. Hudgins and Mrs. Brock were so close, that they were like sisters and White, who referred to Mrs. Brock as "Aunty Margaret," was just a small child when they met. In the fall of 2006, based on the information received from Hudgins, White went to the Property offering financial assistance. White told Mrs. Brock that she "may have to refinance her current loan in order to acquire the funds she needed." White, however, never took any licensing or certification exams related to the mortgage business and is

not a Pennsylvania licensed mortgage originator. White contacted his friend and mentor in the mortgage business, Alim Wallace, at American One Mortgage, for assistance with Mrs. Brock's refinance transaction. Under White's "guidance," Mrs. Brock refinanced with an adjustable rate note in the amount of $120,000 secured by a mortgage given to WMC Mortgage Corp. recorded with the City of Philadelphia at Document ID 51598958. Regrettably, the terms of the loan were unfavorable and unmanageable for Mrs. Brock. Mrs. Brock paid White $1,500.00 for helping with the refinance transaction.

In early 2007, White again heard that Mrs. Brock was experiencing financial troubles through his mother, Hudgins. Hudgins and White, Thomas, and Buckman all knew each other prior to Mrs. Brock. White contacted Thomas, who in turn contacted Buckman. Thomas knew Buckman as a client of hers while at Trinity Insurance Abstract ("Trinity"). She also previously met Hudgins and Ms. Foxworth at closings at Trinity. Hudgins contacted Thomas to possibly assist Mrs. Brock in refinancing. White and Thomas went to the Property in September of 2007 to discuss Mrs. Brock's financial situation after the 2006 refinance transaction. Neither Thomas nor her title agency was authorized to conduct closings in the Commonwealth of Pennsylvania. White explained to Mrs. Brock that she may not be able to refinance because of her poor credit, which White offered to repair. Mrs. Brock paid White $1,300 and $3,900 to for his services to repair Mrs. Brock's credit, and for doing work around Mrs. Brock's house.

Mrs. Brock expressed her desire to continue to live at the Property, and so Thomas and White enlisted Buckman to propose a "buyback program" instead of having Mrs. Brock refinance again. The buyback program was offered by Buckman through Fresh Start, LLC, an entity that Buckman created for the sole purpose of draining equity from people's homes under the guise of helping them get back on their feet. Buckman recruited her parents, the Foxworths,

to be the straw buyers or "investors" on the Property.  Buckman paid her parents $10,000 for their "services" in "investing" in the Property.  To convince Mrs. Brock to go along with the scheme, Mrs. Brock was told that she would be "selling" her house for over $400,000, financed with a $342,000 mortgage, and that, somehow, she would be able to buy it back after a year by paying off the new gigantic mortgage.  Buckman prepared the Agreement of Sale and gave it to Thomas and White.  White told Mrs. Brock to sign, and she did.

Throughout the sale transaction, Mrs. Brock was under the impression that she would sell her house to the Foxworths for one year, and would continue to live there while the Foxworths, through Buckman, paid the mortgage.  Mrs. Brock was told she needed to continue to pay the bills and maintain the upkeep, and then, when the one year expired, she would get the house back and resume paying her original mortgage. Closing took place at the Property on October 19, 2007, while Mrs. Brock's sick husband reclined in bed in the dining room.  Mrs. Brock signed the Deed to Ms. Foxworth and executed the HUD-1 Settlement Statement.  Mrs. Brock, Buckman, and Thomas sat at the kitchen table, with White standing behind Mrs. Brock. Buckman reviewed the buyback program with Mrs. Brock at the closing and advised her that she would be able to purchase the home back after a year.  Buckman told Mrs. Brock that in order to buyback the house she would have to pay off the mortgage executed by the straw buyers by obtaining financing from yet another lender.  Mrs. Brock, however, did not know that Ms. Foxworth was taking out a loan in the amount of $342,000.

According to the HUD, the proceeds of the loan were distributed as follows: $99,256.99 to Buckman (through Fresh Start), $67,517.37 to Thomas (through Unique Management), $127,900.95 to Washington Mutual to pay off the unfavorable 2006 loan brokered illegally by White, and $49,999.90 to Mrs. Brock.

**Facts Pertaining to Defendant Danette Thomas and Byron White**

According to Thomas, she and Mrs. Brock discussed the idea of Thomas working for Mrs. Brock by performing various services such as paying Mrs. Brock's bills and taking Mrs. Brock places. Thomas said that she was to be paid $65,000 *up front*, to act as her caretaker for the period of five (5) years. Nothing to this effect is in writing. To collect the up-front money for these caretaker services, Thomas prepared an invoice under Unique Management and gave the invoice to Buckman. Naturally, Thomas did not give Mrs. Brock a copy of the invoice. Thomas came to Mrs. Brock's home once after the closing transaction with a book and went over Mrs. Brock's bills to make a "bill schedule" for Thomas to come in every month and write out Mrs. Brock's bills. Thomas did not actually provide any services to Mrs. Brock, but rather went over information that Mrs. Brock already knew. Thomas never provided Mrs. Brock with any other kind of assistance.

As far as Thomas was concerned, she was entitled to all the money she received at closing because Mrs. Brock was "the one who decided not to continue with the relationship." A total of $67,517.37 was wired to Thomas by the agent which closed the sale transaction. The account set up by Thomas to receive the money was promptly closed, and Thomas never returned any of it despite her admission that she never performed any caretaking or other services for the benefit of Mrs. Brock. When asked what she did with the $67,517.37 that she received, Thomas testified "I spent it." . When asked what she spent it on, she explained that used the money to pay her own personal expenses including "gas," "car payments," "car insurance" and "electric bills." When asked to explain why she used money that she claimed was for the benefit of Mrs. Brock to pay her own personal expenses, she testified that "it was a way to make up for a lack of income for me to live." White, Thomas's husband, brokered the

first unfavorable loan, without a license, which was paid off when the Respondents tricked Mrs. Brock into selling her home to Buckman's parents. White told Mrs. Brock that the financing for the buyback loan would be arranged through the company that he was starting. White received $1,500 from Mrs. Brock for brokering that first unfavorable loan.

White remained heavily involved with the scheme to take Mrs. Brock's money during the subsequent buyback transaction. In fact, he provided Buckman with Mrs. Brock's phone number, which marked the beginning of the process of tricking Mrs. Brock into selling her home and draining its remaining equity through payments to the Respondents. During the closing on the sale of her house, White was the one who explained to Mrs. Brock that she would be temporarily selling her home to Buckman's parents. White was fully aware that his then-girlfriend Thomas was receiving approximately $68,000 from the proceeds of the sale of Mrs. Brock's Property, which was allegedly an up-front payment for services Thomas never actually performed. White received $500 in cash from Mrs. Brock after the closing on the sale was complete.

## Facts Pertaining to Defendant Leona Hudgins

Mrs. Brock was told by White and Hudgins that she would receive a $40,000 one-year loan, that she would continue living in her home, and that at the end of one year, she would refinance the transaction. Mrs. Brock told Hudgins that she didn't understand the terms of the transaction, but Hudgins told her not to worry, because she herself had received a "bridge loan" before, and that it had worked out well. Hudgins told Mrs. Brock to "just stay well" and that at the end of 12 months, the transaction would be refinanced, and the Property would be returned to Mrs. Brock without any encumbrances. Mrs. Brock was still confused about the terms of the

transaction, but relied on the continued and regular assertions from Thomas, White and Hudgins that after a year, the loan would come due, and she would retake all rights to her home.

In October of 2007, Hudgins opened a joint account titled to herself and Mrs. Brock at a Commerce Bank branch in New Jersey. After the sale transaction, Hudgins changed the mailing address of the joint bank account to "1415 Fitzwater Street, Philadelphia, PA 19146," the address of Hudgins' salon. Over the course of the next eighteen months, Hudgins used her signing power on the account and withdrew approximately $20,000 dollars of the money which had been sent to this account on behalf of Mrs. Brock. Hudgins also convinced Mrs. Brock to pay an additional $5,200 to White so could help repair her credit. According to the banks records, in October of 2009, Hudgins closed the joint account.

## Facts Pertaining to Defendant Silver Buckman

Buckman owned and operated Fresh Start. Buckman's primary business is a "buyback" program, where an investor would "purchase" a home in order to save a homeowner from going into foreclosure. Buckman prepared the Agreement of Sale for the Property. The $20,000 deposit paid by the Foxworths was not received by Mrs. Brock. On or about October 23, 2007, Buckman deposited the check for $99,256.99 made out to Fresh Start Financial Services. The $99,256.99 was supposed to be placed in an escrow account because it was needed to pay the new mortgage taken out by Buckman's parents. However, Fresh Start put the money into the operating account of Fresh Start, and of course it is all gone now. Although Buckman claims that Fresh Start was paid a maximum amount of $5,000 in profit out of the $99,256.99 payment, Buckman also received a commission as a result of this transaction from America One. Fresh Start paid $24,077.00 to Buckman's mother out of the $99,256.99 payment.

Fresh Start was supposed to make the mortgage payments. According to Buckman, Fresh Start did make "some" payments on the mortgage, but the mortgage went into default almost immediately because Buckman had no interest in sending any money to Superior Mortgage when she could just keep it for herself. Mrs. Brock first became aware that the mortgage was not being paid when Mrs. Brock asked Hudgins "when is the property going to be turned back over to me, so I can do what I'm supposed to do in taking over the property that I've been in all my life?" Hudgins answered that Buckman was having trouble with the money. Buckman admits that the mortgage on the Property was not paid for the twelve (12) months as promised. Fresh Start's accounts were merged into one big account, instead of separate escrow accounts. The negligence of Fresh Start by not holding the $99,256.99 in a separate escrow account is the fault of Fresh Start and not the fault of Mrs. Brock, as Buckman was forced to concede. In fact, Buckman admits that Mrs. Brock has a right to be "disappointed" with Buckman as a result of her failure to pay the mortgage—not to mention her outright theft of much of the equity in the Property.

## III.   DAMAGES

- $99,256.99 plus statutory interest from Buckman
- $67,517.37 plus statutory interest from D. Thomas-White
- $67,517.37 plus statutory interest from B. White
- $25,200.00 plus statutory interest from L. Hudgins
- Treble damages against all defendants
- Punitive damages against all defendants
- Attorney's fees

## IV.   WITNESSES

### Liability Witnesses

1. Danette Thomas, 7575 Boulevard Avenue, Pennsauken, NJ 08110
2. Byron White, 7575 Boulevard Avenue, Pennsauken, NJ 08110
3. Leona Hudgins, 1415 Fitzwater Street, Philadelphia, PA 19146
4. Silver Buckman, 1746 Morris Drive, Cherry Hill, NJ 08034
5. Mary Dailey-Smith, M.D., 5610 Wendy Bagwell Parkway, Suite 103, Hiram, GA 30141

      6.      Margaret Brock, 179 Johnson Rd Buena Vista, GA 31803-9319179 (via deposition testimony)

### Damages Witnesses

      1.      Corporate Designee from Chicago Title Insurance Company.  This individual may be reached through Plaintiff's counsel.
      2.      Margaret Brock. 179 Johnson Rd Buena Vista, GA 31803-9319179 (via deposition testimony)


**V.    EXHIBITS**

- Amended Complaint
- November 29, 2006 HUD-1 Settlement Statement
- April 24, 2007 HUD-1 Settlement Statement
- June 1, 2007 HUD-1 Settlement Statement
- September 7, 2007 Agreement for Sale
- September 7, 2007 Power of Attorney
- September 7, 2007 Agent Acknowledgment
- September 10, 2007 Payoff Statement
- September 29, 2007 Signature Card
- October 10, 2007 HUD-1 Settlement statement
- October 15, 2007 Fresh Start Financial Services Invoice
- October 18, 2007 Unique Management and Consulting Services, LLC Invoice
- October 19, 2007 Check Payable to Fresh Start Financial Services
- October 19, 2007 Deed
- October 19, 2007 Note
- October 19, 2007 Mortgage
- October 19, 2007 HUD-1 Settlement Statement
- Commerce Bank Account documents, including cancelled checks and account statements from October 2007 through September 2009
- July 26, 2011 Deed
- Assignment of Rights
- Deposition testimony of Mrs. Brock's treating physicians
- Curriculum Vitae of Mrs. Brock's treating physicians
- Deposition testimony of Margaret Brock
- Deposition testimony of Danette Thomas
- Deposition testimony of Byron White
- Deposition testimony of Leona Hudgins
- Deposition testimony of Silver Buckman
- April 13, 2011 Court Order (Doc. No. 137)
- May 5, 2011 Praecipe to Enter Default (Doc. No. 148)
-  Answer to Amended Complaint by Silver Buckman and Fresh Start Financial Services

- Defendant Leona Hudgin's Answer with Affirmative Defenses and Cross-Claims to Plaintiffs' Complaint
- Defendant Danette Thomas' Answer with Affirmative Defenses and Cross-Claims to Plaintiffs' Complaint
- Defendant Byron White's Answer with Affirmative Defenses and Cross-Claims to Plaintiffs' Complaint
- Defendant Leona Hudgins' Answers to Interrogatories
- Defendant Leona Hudgins' Answers to Requests for Production of Documents
- Defendant Danette Thomas' Answers to Interrogatories
- Defendant Danette Thomas' Answers to Requests for Production of Documents
- Defendant Byron White's Answers to Interrogatories
- Defendant Byron White's Answers to Requests for Production of Documents
- Invoices detailing attorney fees
- Affidavit of Service detailing service of Complaint on Silver Buckman

## VI. ANTICIPATED ISSUES

Mrs. Brock is an 83 year old individual who suffers from progressive dementia and who resides in Georgia.  It is anticipated that Plaintiff will move for the admission of her deposition testimony as it will be established that Mrs. Brock is unavailable for trial pursuant to Federal Rule of Civil Procedure 32(a)(4).  Further, Plaintiff anticipates moving to admit the video deposition testimony of Mrs. Brock's treating physician (Mary Dailey Smith), who is more than one hundred miles from the Courthouse.

                                          **HALBERSTADT CURLEY LLC**

Date:  10/28/2013                        By:   /s/ Scott M. Rothman
                                            Scott M. Rothman
                                            Kelle A. Kilgarriff
                                            *Attorney for Chicago Title Ins.*
                                            *Co, assignee of Plaintiff Margaret Brock*