**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARGARET BROCK, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DANETTE THOMAS, et al., | : | No. 10-687 |
| | : | |
| Defendants. | : | |

<u>**MEMORANDUM OPINION**</u>

TIMOTHY R. RICE                                                          May 21, 2014
U.S. MAGISTRATE JUDGE

      This case provides a rare glimpse into the inner workings of predatory lending practices

targeting the elderly and their impact on the 2008 collapse of our nations' mortgage lending

industry.  At its core, the evidence features the victimization of an elderly woman, Margaret

Brock ("Brock"), by her so-called "family friends," who devised a scheme to enrich themselves

by draining equity from her home.  Defendants' scheme manipulated nearly non-existent lending

protocols in an industry that often turned a blind-eye to such predatory practices.

      Following a two-day, non-jury trial, I find that Defendants Leona Hudgins, Byron White,

Danette Thomas, and Silver Buckman[1] are liable for breach of fiduciary duties, fraud, and civil

conspiracy to violate their fiduciary duties and commit fraud.  Chicago Title Insurance Company

("Chicago") is the assignee of the rights of Brock, who suffers from advanced dementia.[2]

---

[1]     Defendants are pro se.  During pretrial telephone conferences, at the beginning of trial,
and before they testified, I advised Defendants of their Fifth Amendment rights.

[2]     Due to her dementia, Brock could not attend trial and was unavailable as a witness.  <u>See</u>
Fed. R. Evid. 804(a)(4); N.T. 12/16/13 at 18-19.  On June 20, 2011, Brock was deposed,
although none of the Defendants attended.  At trial, I found all Defendants had notice and an
opportunity to attend Brock's deposition, and had a motive to cross-examine and challenge

Although Chicago also asserted a RICO claim against Buckman and a RICO conspiracy against all of the Defendants, it failed to produce sufficient evidence to establish such claims, particularly the existence of an enterprise or predicate acts, as required to prove RICO liability.

I credit Brock's deposition testimony, because it is corroborated and supported by other evidence in the record. I discredit the testimony from Hudgins, White, and Thomas because it was inconsistent with Brock's testimony and evidence in the record, contradictory to statements they made in previous pleadings, and inconsistent with a common understanding of how mortgage transactions are processed, e.g. documented on HUD-1 paperwork. In considering Buckman's deposition testimony, I draw a negative inference against her due to her invocation of her Fifth Amendment rights that a truthful answer would tend to incriminate her.[3]

---

Brock, because they were Defendants at that time. N.T. 12/17/13 at 26-27; Fed. R. Evid. 804(b)(1). I admitted Brock's deposition testimony at trial as an exception to hearsay. See N.T. 12/17/13 at 26-27; Fed. R. Evid. 804(b)(1).

Brock had entered into a Settlement Agreement with some of Defendants in this case and assigned her interests, rights, and claims to Chicago against the remaining Defendants in exchange for "good and valuable consideration[.]" Assignment of Pl.'s Rights (doc. 182) at 2.

[3] Buckman invoked her Fifth Amendment right to refuse to testify at trial based on the advice of a criminal defense attorney, Joshua Briskin, Esquire. N.T. 12/16/13 at 16; N.T. 12/17/13 at 28; U.S. Const., V ("[n]o person ... shall be compelled in any criminal case to be a witness against himself."). Buckman agreed that truthful answers to the questions about the circumstances surrounding Brock's Property transaction would tend to incriminate her. N.T. 12/16/13 at 215-16; N.T. 12/17/13 at 28. I am entitled to draw an adverse inference against her. See N.T. 12/17/13 at 29; Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]").

Chicago claims that, because Buckman failed to respond to the motion for summary judgment or participate in the pretrial proceedings, all of the allegations against her in the Amended Complaint should be deemed admitted. Buckman's failure to respond did not result in a grant of summary judgment against her and Chicago has failed to cite any federal law supporting its claims. Chicago's Prop. at 24 (citing Pennsylvania law). Thus, the claims against Buckman will be decided on the merits, with an adverse inference. See Baxter, 425 U.S. at 318.

I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

The Set Up:

1.      Brock and Alfonzo Brock ("Decedent")[4] owned and lived at 1611 Swain Street, Philadelphia, Pennsylvania (the "Property").  Brock's Dep. at 9, 11-12.  The Property had been in Brock's family for approximately 80 years.  Id. at 11.

2.      In 2006, Decedent and Brock suffered from health problems.  Brock's Dep. at 10-11, 13, 14, 17.  During this time, Brock handled her and Decedent's finances.  Id. at 17-18.  Brock decided to obtain a loan to assist with medical bills and make improvements on the Property.  Id. at 16, 20.

3.      Brock confided to Defendant Leona Hudgins, her friend and beautician for more than 30 years, that she was experiencing financial troubles.  N.T. 12/16/13 at 27-30.  Hudgins portrayed herself and Brock as sisters.  Id. at 31-34.

4.      Hudgins told Brock that she had refinanced her home and received money.  N.T. 12/16/13 at 29.  Hudgins then told her son, Defendant Byron White, that Brock was having financial issues and suggested he help her.  Id. at 30.  White had known Brock since he was a child and called her "Auntie."  Id. at 69.

5.      White visited Brock and told her that she may have to refinance the Property's then-existing mortgage to acquire the funds she needed.  Ex. 31, White's Ans. ¶ 43.  The Property had a mortgage of approximately $81,000.  Brock's Dep. at 16-19.  Brock believed White was soliciting real estate business in her neighborhood.  Id. at 25.  Brock, however, trusted

---

[4]      Decedent died in 2010.  Ex. 21, Brock's Dep. 87-88.

White because she trusted Hudgins.  Id. at 24-25.  White was not a licensed mortgage broker or originator, and therefore, had to contact Alim Wallace, a mortgage broker, to refinance Brock's home.  N.T. 12/16/13 at 30, 70-71; White's Ans. ¶ 47.  Wallace was employed by American One Mortgage.  N.T. 12/16/13 at 76.

6.    Although Decedent had previously paid the Property's mortgage payments, Brock handled the refinancing alone because of Decedent's declining health.  Brock's Dep. at 33.

7.    On November 29, 2006, Brock and Decedent refinanced the Property.  N.T. 12/16/13 at 30; Ex. 2, 4/24/06 HUD-1.  The previous mortgage of $81,612.05 was paid and the new mortgage for $120,000 was issued by WWC Mortgage Corporation.  4/24/06 HUD-1. Brock and Decedent received only $10,435.68 from the refinancing, which was insufficient to cover Brock's continuing expenses or provide the assistance White had promised.  N.T. 12/16/13 at 30, 32, 79; Brock's Dep. at 33-35; 4/24/06 HUD-1.  Other settlement charges totaling $24,952.27, more than double Brock's net proceeds, were paid to other entities.  4/24/06 HUD-1 at 2.  Wallace received $3,800 in connection with the refinance, 36% of Brock's net proceeds. N.T. 12/16/13 at 76; 4/24/06 HUD-1.

8.    Although White had no role in the refinance, he accepted $1,500 from Brock as a "gift" for his services—15% of Brock's net proceeds.[5]  N.T. 12/16/13 at 73, 76; see Brock's Dep. at 114-15.  White did not declare the $1,500 as income on his tax return.  N.T. 12/16/13 at 73.  He accepted the money, knowing Brock was experiencing significant financial problems, "because when it [came to him] it was just that type of relationship."  Id. at 73-74, 78-79.

9.    In 2007, Decedent's condition worsened.  Brock's Dep. at 48-50, 83-84.  Brock again confided to Hudgins that she needed funds and Hudgins relayed this information to White.

---

[5]    The Amended Complaint alleged the memorandum line of Brock's check to White states the $1,500 was for fees.  Am. Compl. ¶ 46.  The check, however, was never introduced at trial.

4

N.T. 12/16/13 at 79, 85.  Hudgins also contacted Defendant Danette Thomas, who had

refinanced Hudgins' mortgage.  Ex. 29, Hudgins' Ans. at ¶ 52.  Thomas had more than 20 years

of real estate experience, including owning and operating title agencies.  N.T. 12/16/13 at 161-

62.  Thomas co-owned and co-managed Trinity Insurance, Abstract, and Title Agency, LLC

("Trinity"), and owned Unique Management and Consulting Services, LLC ("Unique

Management").[6]  Id. at 151.  Thomas told Hudgins she was not licensed to do business in

Pennsylvania, but would try to help Brock.  Hudgins' Ans. at ¶ 52.

      10.     White asked Thomas to accompany him to Brock's home.[7]  N.T. 12/16/13 at 160.

Brock told Thomas that she needed someone with real estate experience, explained she and her

son needed money, and wanted to know how she could use her Property.  Id.; Ex. 30, Thomas'

Ans. at ¶ 60.  Thomas agreed to provide Brock with "assistance" and discuss Brock's financing

options "free of charge."  N.T. 12/16/13 at 160; Thomas' Ans. at ¶ 60.

      11.     Due to a drop in Brock's credit score after her 2006 refinance, she could not

refinance in 2007.  N.T. 12/16/13 at 80-81.

      12.     Hudgins suggested that Brock sell the Property on a temporary basis to receive

money.  Brock's Dep. at 39.  Hudgins said she had used a similar "loan" multiple times, assured

---

[6]     Thomas designed Unique Management to provide real estate consulting or management services, when Trinity's business declined due to decreased property purchases and refinancing. N.T. 12/16/13 at 156-58.

     Unique Management did not have an operating agreement.  Id. at 158.  Thomas was its sole owner and employee, but did not draw a salary.  Id.  Rather, she took money from Unique Management's operating account.  Id.  Thomas claims she did not know how to file a tax return, and somehow blames this lawsuit for her failure to file a tax return.  Id. at 163-64.  Although she contends she planned to file a tax return eventually, Thomas intentionally did not file Unique's taxes in the appropriate year.  Id. at 165-66.  Thomas was not licensed to do business in Pennsylvania.  Id. at 160.

[7]     White had met Thomas through Alim Wallace, and they began dating in 2007.  N.T. 12/16/13 at 114.  White and Thomas married on July 31, 2010.  Id.

Brock she would receive the cash she needed, and told her the Property would be returned to her after one year.  Id. at 37, 39.  Brock perceived Hudgins as a businesswoman who would not lie. Id. at 37.  Brock relied on Hudgins' information based on Hudgins' past experiences.  Id. at 94.

13.     White and Thomas then discussed Brock's Property with Defendant Silver Buckman, a licensed mortgage broker, and sole owner of Fresh Start Financial Services ("Fresh Start").  N.T. 12/16/13 at 79-80; Ex. 25, Buckman's Dep. at 144; see Jairett v. First Montauk Sec. Corp., 153 F. Supp. 2d 562, 567 (E.D. Pa. 2001) ("A broker is defined generally as 'one whose business it is to bring buyer and seller [or borrower and lender] together.'") (citing City of Phila. Tax Review Bd. v. Toben, 379 A.2d 1361, 1365 (1977)).  Buckman also had worked for American One Mortgage, whose president was Salvatore Esposito.  Am. Compl. ¶ 27; Buckman's Dep. at 78.

14.     Thomas knew Buckman through real estate transactions, known as "buybacks," which involved financially distressed property owners selling their property to a third party. N.T. 12/16/13 at 153-54.  These owners were told they could buy their property back once their finances improved, usually in 12 to 18 months.  Thomas had previously referred her clients to Buckman for buybacks.  Buckman's Dep. at 82.  Thomas, through Trinity, also had closed six or seven property sales in New Jersey with Buckman and/or Fresh Start.  N.T. 12/16/13 at 168. Buckman's parents, Vincent and Cynthia Foxworth (the "Foxworths"), generally purchased the properties because they had good credit.  Id. at 154; Buckman's Dep. at 92.

15.     White learned Buckman could do a buyback, or what White described as a "bridge loan," a transaction that other mortgage brokers could not.  N.T. 12/16/13 at 83. Buckman completed buyback transactions for homeowners facing foreclosure.  Buckman's Prop. Facts (doc. 237) at ¶ 1.

16.     Thomas and White explained to Buckman that Brock wanted to do a buyback because "they" were trying to generate cash for Brock from the Property to pay Decedent's medical bills.  N.T. 12/16/13 at 79-84; Buckman's Dep. at 81, 130; Buckman's Prop. Facts at ¶ 1.  Buckman knew Brock could not refinance.  Buckman's Dep. at 81.  She also knew Brock was not in danger of foreclosure.  Id. at 81-82.

17.     White and Thomas went to Brock's Property on a few occasions to talk to her about the buyback.  N.T. 12/16/13 at 84.  Contrary to White's claim that Decedent was "fine," "coherent," and sometimes good mentally, id. at 84-85, Decedent lay in a bed in the dining room and appeared to be ailing.  Id.

18.     Thomas explained the buyback to Brock.  N.T. 12/16/13 at 161.   Brock asked Thomas if the transaction made sense and if it was something she should do.  Id.  Thomas, based on her 20 years' business experience, gave Brock "the knowledge" she had about those transactions.  Id.

19.     Decedent also asked Thomas for her opinion.  N.T. 12/16/13 at 201.  Thomas told him she thought it would help him, Brock, and Alfonso Brock, Jr., their son.  Id.

20.     Thomas knew Decedent would not be at the closing because of plans to move him to Georgia to live with Alfonso.  N.T. 12/16/13 at 199.  On September 7, 2007, Thomas notarized a power of attorney, which Brock also signed, that allowed Brock to handle the transaction alone.  Thomas' Ans. at ¶¶ 70-71; N.T. 12/16/13 at 84-85, 87-88; Ex. 6, POA.

The Scheme Unfolds:

21.     Thomas and Buckman spoke to Brock on the phone about the buyback.  N.T. 12/16/13 at 147.  The Foxworths, Buckman's parents, were going to be the "investors" in the Property.  Id. at 94-95.

22.     The buyback would require Brock to obtain a $342,000 mortgage to repurchase the Property.  Buckman's Dep. at 131.  This meant Brock would have a monthly mortgage payment of $3,000, which Buckman acknowledged was "high," id. at 22-23, especially for an elderly woman in financial distress.

23.     Brock believed she would sell her Property to the Foxworths for one year, continue to live in the Property, and the Foxworths, through Buckman, would pay the mortgage on her behalf.  See Brock's Dep. at 41-42.  Brock thought all the Defendants knew each other and would take care of the transaction.  Id. at 40.

24.     White admits he did not understand the buyback, but thought it was a good idea. N.T. 12/16/13 at 124.  He falsely claimed that Brock somehow understood this complicated transaction, even though he, who was learning "the business," did not.  Id. at 117-18.

25.     On October 1, 2007, Hudgins and Brock opened a joint checking account at Commerce Bank in New Jersey, and deposited $100.  Ex. 18, Bank Docs. at 12.  The account was intended to pay Brock's bills.  Brock's Dep. at 57-58.

26.     Hudgins sent Brock's bank statements to her hair salon, not Brock's address, and Hudgins concealed the account from her husband.  Brock's Dep. at 112.

The Rip-off:

27.     On October 10, 2007, Brock, White, Thomas, Buckman, the Foxworths, and a settlement agent, brought by Buckman, attended the buyback closing at Brock's Property.  N.T. 12/16/13 at 89.  Brock let them into the Property because they were with White.  Brock's Dep. at 101-02.

28.     At the closing, Thomas did not ask Buckman to see a copy of Fresh Start's invoice or the HUD-1,[8] and claimed she did not want to interfere with the settlement officer's duties.  N.T. 12/16/13 at 168-72.

29.     White attended the closing to "make sure [Brock] was happy."  N.T. 12/16/13 at 89-90.  He did not know the amount of money the investors received, the appraised value of the Property, or the amount of monthly mortgage payments.  Id. at 95, 97, 101.  White stood behind Brock as she executed the Deed on behalf of herself and Decedent.  Id. at 200; Buckman's Dep. at 127, 156; Ex. 14, Deed.  Brock thought she was doing what was best for both her and Decedent.  Brock's Dep. at 83.

The Feeding Frenzy at the Closing:

30.     The contract sale price for the Property was $380,000.  Ex. 10, 10/10/07 HUD-1; N.T. 12/16/13 at 99-100.  Brock did not negotiate the price.  Brock's Dep. at 67.  The then-existing mortgage was only approximately $120,000.  N.T. 12/16/13 at 88, 99; 9/10/07 Payoff Statement; 10/10/07 HUD-1.  Before the buyback, Brock and Decedent had approximately $253,000 in equity in the Property.

31.     After the buyback, having signed over the title of Property to the Foxworths, Brock was living in a home that she no longer owned and had no control over whether that Property's mortgage was paid.

32.     Buckman's mother was issued a loan for $342,000 to purchase the Property. 2007 HUD-1.  The Defendants then satisfied Brock's $127,000 mortgage and divided almost all of the remaining sale proceeds among themselves.

---

[8]      A "HUD-1" is real estate form that lists all the borrower's and seller's charges in the transaction and allows the parties to see the disposition of funds.

33.     Fresh Start received $99,256.89, 26% of the contract sale price of the Property. 10/10/07 HUD-1; 10/15/07, Fresh Start Inv.; N.T. 12/16/13 at 114, 173-74, 186.  This money was deposited into Fresh Start's operating account.  Buckman's Dep. at 31-32, 136, 141. Buckman claims Brock consented to Fresh Start's acceptance of those funds, which included a $5,000 fee. Id. at 137-38.  Buckman also received a commission from American One. Id. at 78-80.

34.     Although Brock was told that more than $99,000 was deposited into Fresh Start's operating account to pay the Property's mortgage over the next year, neither the HUD-1, nor the Fresh Start invoice, referred to such an account.  10/10/07 HUD-1; Ex. 11, 10/15/07 Fresh Start Inv.  Rather, Fresh Start submitted an invoice for $99,256.89 at the closing, claiming it provided the following services associated with Brock's Property: (1) locating a buyer; (2) preparing the sale contract; (3) reviewing the related documents, including appraisal and title; and (4) corresponding with the mortgage company for updates.  10/15/07 Fresh Start Inv.

35.     The Foxworths received an "investor's fee" of $10,000 or $15,000.  Buckman's Dep. at 28.  This payment does not appear on the HUD-1.  Although the HUD-1 stated that the Foxworths had paid "earnest money" of $20,000, as well as $24,077.39 in cash at the closing, the Foxworths did not make, nor did Brock receive, such payments.  Buckman's Dep. at 28. Disposition of the $20,000 is unclear.  Buckman, from Fresh Start's account, however, "cut a check" to Mrs. Foxworth for $24,077.39, as well as paid the Foxworths their investor's fee of either $10,000 or $15,000.  Id. at 28, 148.  The Foxworths, as deed holders, also became the beneficiaries of the remaining $40,000 in equity left in the Property at the time of closing. Compare 10/10/07 HUD-1 Contract Price ($380,000) with Amount of New Loan ($342,000); 10/10/07 HUD-1 Lines 101, 202, 401.

36.     Thomas received $67,517.37 from the buyback, or 18% of the contract sale price, which was wired into Unique Management's operating account.  N.T. 12/16/13 at 104, 159, 195, 198-99.  To disguise the payment, Thomas submitted a phony Unique Management invoice to Buckman at closing for payment directly from the settlement, which kept Brock from accessing her own funds.  See id. at 198.  Thomas claims she was going to perform future "personal care services" for Brock over the next five years.  N.T. 12/16/13 at 104, 159, 195, 198-99.  Thomas claimed the money was to compensate her for helping Brock with bills, transportation, grocery shopping, and errands.  Id. at 102, 197-98; 10/18/07 Unique Management Inv.  It was Thomas' idea to perform these services for Brock, and White and Thomas together set the price for these services, at a rate of $250 per week for five years.  N.T. 12/16/13 at 104, 106.  White falsely claimed it was Brock's idea to prepay Thomas with proceeds from the buyback so Brock's son could not access the buyback proceeds.  Id. at 198.

37.     Thomas performed only minimal personal care services to Brock through Unique Management.  N.T. 12/16/13 at 159; see id. at 107.  In total, Thomas made a few phone calls and completed 13 other tasks, including, visiting Brock's home five times, contacting agencies to receive senior discounts, and providing transportation to three doctors' appointments and twice to the bank.  Id. at 107-08, 135-37, 188-90, 192, 193, 209-10.  Brock said Thomas provided her with no meaningful assistance.  Brock's Dep. at 46.

38.     Brock had no written agreement with Thomas or Unique Management for the payment of $67,517.37 over the five-year term.  N.T. 12/16/13 at 199.  Nearly all of Unique's revenue was generated from the proceeds of Brock's buyback transaction, id. at 163, 205, and used to pay White and Thomas' personal bills.  Id. at 110-11, 205-06.

11

39.     Although Buckman knew Thomas was going to receive money from Brock's buyback transaction, she did not know what the payment was for and did not care.  Buckman's Dep. at 82.

40.     Brock received merely $49,999.90, 13% of her Property's sale price, and thought she would have received more.  10/10/07 HUD-1; Brock's Dep. at 63-64.

41.     After the closing, Brock paid Hudgins $1,000 for her "assistance."  Brock's Dep. at 113.

42.     On October 19, 2007, Brock's net proceeds of $49,999.90 was wired into the joint account Hudgins controlled.  Bank Docs. at 17.  On October 24, 2007, Brock and Hudgins wired Alfonso, Brocks' son, $20,000.  Id. at 18.  Brock and Hudgins also opened a certificate of deposit ("CD") for $20,000.  Id. at 11.  Brock did not receive any bank statements and was not aware of the amount of money in the account.  Brock's Dep. at 111-13.  After October 24, 2010, Hudgins changed the mailing address on the joint bank account from her salon to her sister's address.  Compare Bank Docs. at 12, 19, with N.T. 12/16/13 at 65-66.

Piling On:

43.     On June 30, 2008, Brock and Hudgins' CD matured and the joint account was credited $20,595.80.  Bank Docs. at 25-26.

44.     When things "were getting a little messy" concerning her dealings with Brock, Hudgins told Brock that she was taking her own money out of the joint account.  Brock's Dep. at 112.  Hudgins falsely testified Brock owed her $13,000 for past debts.  N.T. 12/16/13 at 47.  On July 10, 2008, Hudgins: withdrew $20,000 from the joint account; cashed $1,000; deposited

$1,000 into a separate checking account; and deposited $18,000 into a separate savings account.[9] Bank Docs. at 25; N.T. 12/16/13 at 46-52.

45.     The remainder of the joint account, excluding the CD, was eventually spent. Bank records establish Hudgins withdrew further money from the joint account.  <u>See</u> Bank Docs. at 9-14, 25-26, 32.

46.     Following the closing, Brock paid White an additional $5,400 to "clean up" her credit.  Hudgins' Ans. at ¶ 116; N.T. 12/16/13 at 90.  Although White admits he was still learning "the business," White accepted the fee.  N.T. 12/16/13 at 93.  White falsely claimed he sent letters to dispute items on Brock's credit report.  <u>Id.</u> at 90.

<u>The Knock Out Punch:</u>

47.     Brock became aware that the Property's mortgage was not being paid, as Defendants had promised, when Hudgins said Buckman was having money troubles.  Buckman's Dep. at 81.  Brock questioned Hudgins about the Property after neither Thomas nor Buckman responded to Brock's inquires.  <u>Id.</u> at 112.

48.     Brock received mail addressed to the Foxworths at the Property.  Brock's Dep. at 80.  Hudgins observed Brock opening mail to the Foxworths, told her that it was illegal for her to do so, and said she should contact the Foxworths to determine what was happening with the Property.  Hudgins' Ans. at ¶ 119.  Brock opened a notice of foreclosure.  <u>Id.</u>  Hudgins asked Thomas to investigate the foreclosure for Brock.  <u>Id.</u>

---

[9]     Hudgins first explained she had given Brock money from refinancing Hudgins' own home and, after the CD matured, had merely recollected the money.  N.T. 12/16/13 at 47. Hudgins then changed her testimony, stating she gave Brock almost all of the matured CD proceeds, keeping only $3,000.  <u>Id.</u> at 51.  Hudgins falsely claimed she gave Brock $10,000 and kept the other $10,000, even though Brock allegedly owed her $13,000.  <u>Id.</u> at 51-52.  Her testimony was riddled with inconsistencies and is discredited.

49.     Buckman told Thomas that Mrs. Foxworth was obtaining a loan modification. N.T. 12/16/13 at 190.  Buckman falsely claims the loan modification was for Brock's benefit, "in an attempt to obtain a feasible payment for Mrs. Brock to pay in order to remain in the property." Buckman's Prop. Facts at ¶ 6.  Buckman also told Thomas that Fresh Start's bank account, containing the money that was supposed to pay Brock's mortgage, had been frozen due to a lawsuit brought against her in connection with another buyback transaction.  N.T. 12/16/13 at 190; Buckman's Dep. at 103.

50.     Thomas failed to take any actions to protect Brock from Buckman's failure to have Fresh Start or the Foxworths pay the mortgage, as promised.  See N.T. 12/16/13 at 191.

51.     Brock told Thomas she did not care how it was going to happen, but she wanted to stay in her family's Property.  N.T. 12/16/13 at 192.  Thomas and Buckman discussed a rental agreement with Brock for the amount of the modified mortgage.  Id.  Thomas said the rent would be based on what Brock could afford to pay, and asked for Brock's pension statements and income information to work out the details with Buckman.  Hudgins' Ans. at ¶ 130.  Finally becoming suspicious, Brock stopped taking Thomas' calls.  See Thomas' Ans. at ¶ 132.

52.     Buckman did not know what mortgage payments were made on Brock's Property. Buckman's Dep. at 29-30.  She did not know whether the Property went into foreclosure before the 12 months expired, after which Brock supposedly would have been able to repurchase the Property.  See id. at 34, 139, 140-41.  Further, Buckman has failed to account for the $99,256.99 deposited into Fresh Start's account at the closing.  Id. at 22-24, 28-29, 135, 143-44.

53.     In August 2009, Brock stopped talking to Hudgins.  N.T. 12/16/13 at 53-54; Hudgins' Ans. at ¶ 132.  On August 24, 2009, Hudgins closed the joint account.  Bank Docs. at 43-44.

14

54.     Unique Management is no longer operating and no longer has an operating account.  N.T. 12/16/13 at 112, 205.

55.     Fresh Start closed in 2008 and no longer has an operating account.  Buckman's Dep. at 76, 144.

56.     On July 26, 2011, pursuant to a settlement in this case, Mrs. Foxworth deeded the Property back to Brock, publically acknowledging that the Deed transferring title from Brock to the Foxworths had been obtained by fraud and should be voided.  Ex. 19, Confirmatory Deed.

## CONCLUSIONS OF LAW

1.     Chicago seeks judgment on the following claims: (1) breach of contract against Thomas and Buckman; (2) breach of fiduciary relationship against all Defendants; (3) fraud against all Defendants; (4) civil conspiracy to breach fiduciary duties and commit fraud against all Defendants; (5) violation of 18 U.S.C. § 1962(c) ("RICO") against all Defendants; and (6) § 1962(d) ("RICO conspiracy") against all Defendants.  Chicago seeks compensatory damages, interest, punitive damages, and attorney's fees.

2.     Chicago did not submit proposed conclusions of law for the following claims in the Amended Complaint: (1) Unfair Trade Practices and Consumer Protection Law (Count IV); (2) Real Estate Settlement Procedures Act (Count V); (3) Negligence (Count VI); (4) Concerted Tortious Conduct (Count IX); (5) Action to Quiet Title (Count X); and (6) Action to Quiet Title, in the alternative (Count XI).  Thus, those claims are dismissed.  Further, Chicago has failed to assert any proposed conclusions of law against Defendants Trinity, Unique Management, Fresh Start, or American One.  Thus, those Defendants also are dismissed.

**Breach of Contract**

3.      Chicago did not allege a breach of contract claim in its Amended Complaint.  <u>See</u>
Chicago's Prop. at 25-27; Am. Compl.  Rather, Chicago asserted that claim for the first time in
its Motion for Summary Judgment.  <u>See</u> 8/13/12 Order (doc. 210) at 8-9.  Chicago has failed to
assert any basis for which I may now grant judgment in its favor on that claim.  Thus, judgment
cannot be entered in favor of Chicago for a breach of contract claim.

**Breach of Fiduciary Duty**

4.      A fiduciary relationship exists "whenever one person has reposed a special
confidence in another to the extent that the parties do not deal with each other on equal terms."
<u>Reginella Const. Co., Ltd. v. Travelers Cas. & Sur. Co. of Am.</u>, 949 F. Supp. 2d 599, 611 (W.D.
Pa. 2013) (quoting <u>In re Clark's Estate</u>, 359 A.2d 777, 781 (Pa. 1976)).  "The essence of such a
relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust
for personal gain on the other."  <u>Banner Life Ins. Co. v. U.S. Bank, NA</u>, 931 F. Supp. 2d 629,
634 (D. Del. 2013) (quoting <u>In re Estate of Scott</u>, 316 A.2d 883, 885 (Pa. 1974)).

5.      A plaintiff asserting a breach of fiduciary duty claim must show: (1) a
confidential relationship with the defendant; (2) the defendant intentionally or negligently failed
to act in good faith and solely for plaintiff's benefit; (3) an injury by the plaintiff; and (4) the
defendant's failure was "a real factor" in bringing about plaintiff's injuries.  <u>Baker v. Family
Credit Counseling Corp.</u>, 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006) (quoting Pa. S.S.J.I. §
4.16)).

6.      "Contractual relationships . . . do not ordinarily give rise to confidential or
fiduciary relationships between the parties."  <u>Onconome, Inc. v. Univ. of Pittsburgh</u>, No.
09CV1195, 2009 WL 5064481, at *16 (W.D. Pa. Dec. 17, 2009) (citing <u>Cottman Transmission</u>

Systems, LLC v. Kershner, 536 F. Supp. 2d 543, 556 (E.D. Pa. 2008)).  "A confidential or fiduciary relationship does not exist merely because one party relies on and pays for the specialized skill or expertise of the other party."  Id. (citing eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. Ct. 2002)).

      7.     "[A] business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to another."  In re Scott, 316 A.2d at 886.  "The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side."  Onconome, 2009 WL 5064481, at *16  (citing eToll, 811 A.2d at 23).

Breach of Fiduciary Duty-Hudgins

      8.     Hudgins had a confidential relationship with Brock.  See Baker, 440 F. Supp. 2d at 414-15.  They were friends for more than 30 years, and Brock confided in Hudgins regarding her financial troubles.  Brock trusted and relied on Hudgins' advice regarding refinancing and the buyback because of Hudgins' purported experience.  Brock demonstrated her trust in Hudgins by allowing Hudgins to open a joint bank account with her to help her pay Brock's bills.

      9.     Hudgins intentionally failed to act in good faith and Brock's best interest by withdrawing $20,000 from the joint account and depositing $19,000 into her personal accounts, leaving Brock a minimal residual.  She also failed to act in good faith by advising Brock to engage in a buyback, referring Brock to White and Thomas, and assuring Brock she would receive the money she needed and her Property would be returned.

      10.    Brock was financially injured by Hudgins' actions at a time she already was in desperate financial straits.  The money Hudgins took constituted almost half of the proceeds

Brock received from the buyback.  Further, due to Brock's reliance on Hudgins' advice and referral to White and Thomas, Hudgins caused Brock to lose title and equity to her Property. The evidence established by a preponderance of the evidence that Hudgins is liable for breaching her fiduciary duty.[10]

Breach of Fiduciary Duty-White

11.     Brock also had a confidential relationship with White, whom she knew since he was a child, and called her "Auntie."  On the day of the closing, Brock allowed all of the individuals engaged in the scheme to enter her Property only because they came with White.  As White noted, Brock believed he would never harm her.

12.     White failed to act in good faith or in Brock's best interest by allowing Thomas to divert from Brock more than $67,000 for five years of future "personal care services" out of the mortgage buyback proceeds, and by having Brock pay him $5,400 for credit repair services, an unreasonable amount for the minimal actions he claimed to have provided.  White knew of Brock's financial distress dating back before 2006.  White also benefited from the payment to Thomas because Thomas paid his personal bills from Unique Management's operating account, which was funded almost exclusively from Brock's buyback.

13.     Brock incurred a loss of more than $72,000, as well as the loss of title and equity in her Property, due to White's role in the buyback scheme.  This injury was a proximate result

---

[10]     Contrary to Chicago's argument, Chicago's Prop. at 30; N.T. 12/16/13 at 90-93, Hudgins is not liable for the $5,400 Brock paid White for credit repair, because the evidence shows that those services were fabricated by White and Thomas and paid to White.

Chicago also claims that Hudgins', mistyped as White's, "fiduciary breach has given rise to damages in the principal amount of the proceeds that Thomas and White received from the sale, which was $25,200," Chicago's Prop. at 31, but is not clear what this figure is based on or why Hudgins should be liable.

of Brock's trust in White and his support of Thomas.  White's actions were a real factor in Brock's loss of the equity in her home and additional money after the buyback.

14.     The evidence established by a preponderance of the evidence that White is liable to Brock for breaching his fiduciary duty.

Breach of Fiduciary Duty-Thomas

15.     Thomas had a confidential relationship with Brock.[11]  Although business associations are not usually the basis for a fiduciary duty, Brock surrendered substantial control of her Property to Thomas, who held herself out as having more than 20 years of real estate experience.  She advised both Brock and Decedent that the buyback would get them the money they needed.  Thomas also acted as a liaison between Buckman and Brock.  Thomas notarized Decedent's power of attorney so Brock could complete the transaction alone.  This evidence establishes Thomas executed substantial control over Brock's decision to enter into the buyback. Brock's "'weakness, dependence, or trust, justifiably reposed'" in Thomas, see Onconome, 2009 WL 5064481, at *16 (quoting Frowen v. Blank, 425 A.2d 412, 416-17 (1980)), also is evidenced by her prepayment of over $67,000 to Thomas to perform unspecified services sometime in the future.  Moreover, Thomas put herself in a position where Brock would depend on her for personal care services for the next five years, when Brock would not have any other family in the area.

16.     Thomas failed to act in good faith and for Brock's benefit by advising her to enter into the buyback, accepting more than $67,000, and keeping it without justification or Brock's informed consent.

---

[11]     Although Chicago argues Thomas undertook a fiduciary responsibility to hold and use the buyback proceeds of approximately $67,000 for Brock's benefit, Chicago's Prop. at 27, the evidence shows Thomas received the $67,000 disguised as prepaid compensation to provide personal care services.  N.T. 12/16/13 at 102, 194-96.

17.     Amazingly, Thomas claims Brock breached their personal care services agreement, because she would no longer accept Thomas' calls.  Thomas' Findings at 4.  Brock, however, stopped talking to Thomas only after Thomas asked for Brock's pension statements and personal information, as a way to obtain more money from Brock after the Property was in foreclosure.  Thomas, instead of finding a way to hold Buckman accountable for failing to pay the Property's mortgage, asked Brock for more money to obtain a rental agreement, further demonstrating the breach of her duties.

18.     Thomas also argues Brock "willingly and without coercion, executed a legally binding Agreement of Sale[,]" and, thus she did not "advise, instruct or coerce Brock into selling her home."  Thomas' Prop. Findings at 1-2.  Brock, however, executed the agreement based on her reliance on Thomas and believed Thomas could advise her about the use of her Property to obtain money.  By Thomas' admission, Brock sought her advice because of her real estate expertise and Thomas acted as a liaison between Brock and Buckman in translating the buyback scheme.  See Thomas' Findings at 2.

19.     Brock was harmed by Thomas' breach of her fiduciary duties, which caused Brock's financial loss of over $67,000 from the buyback proceeds directly to Thomas, the loss of title in her family Property, and the loss of equity in the Property.  A preponderance of the evidence establishes Thomas is liable to Brock for breaching her fiduciary duty.

Breach of Fiduciary Duty-Buckman

20.     Buckman, a mortgage broker, owed a fiduciary duty to Brock, the principal.  See Buckman's Dep. at 143-44 (Q: Well, weren't you holding money in trust for Mrs. Brock to make those payments?  [Buckman's Answer].  Yes.  Yes.  And I was trying to figure out – I still have not figured out to this point where all the funds went.");  In re Barker, 251 B.R. 250, 259 (E.D.

20

Pa. 2000).  A mortgage broker "has a duty to 'advise his principals of relevant facts and circumstances known to the broker.'"  Id. (citing Alfaro v. E.F. Hutton & Co., Inc., 606 F. Supp. 1100, 1120 (E.D. Pa. 1985)).  Moreover, although a contractual relationship does not always create a fiduciary relationship, such a duty exists where "the Debtor's lack of financial sophistication and knowledge caused her to entrust almost a blind faith to the broker in its undertaking." Id.

21.     Brock was an elderly, unsophisticated borrower, desperate for money for home improvements and medical bills, and entrusted Buckman with the buyback transaction.  Brock gave Buckman a substantial portion of the sale proceeds because she relied on Buckman to make monthly mortgage payments on the Property, as Buckman had promised.  Brock also signed the Deed of the Property over to Buckman's parents, whom Buckman falsely portrayed as "investors."

22.     Buckman breached her fiduciary duty by failing to: make the mortgage payments; account for the money deposited into Fresh Start's account; and ensure Brock received all of the funds to which she was entitled out of the buyback transaction.  Brock was harmed by Buckman's breach of fiduciary duty.  Buckman was a real factor in bringing about Brock's injury by orchestrating the buyback and failing to pay the mortgage.  By a preponderance of the evidence, Buckman is liable for breaching her fiduciary duty.

**Fraud**

23.     To prove fraud, a plaintiff must establish the following by clear and convincing evidence: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the

resulting injury was proximately caused by the reliance." <u>Freeman v. Pittsburgh Glass Works,</u>

<u>LLC</u>, 709 F.3d 240, 256-57 (3d Cir. 2013) (quoting <u>EBC, Inc. v. Clark Bldg. Sys.</u>, 618 F.3d 253,

275 (3d Cir. 2010)).

<u>Fraud-Hudgins</u>

24.     After Brock twice confided to Hudgins about her financial problems, Hudgins

convinced Brock to engage in a buyback that Hudgins claimed would give Brock the money that

she needed and return the Property after one year.  Hudgins told Brock that she had previously

completed a buyback and received money.  Such representations were material.  Brock needed

money for medical bills and home improvements.

25.     Hudgins made these statements knowing their falsity or with reckless disregard as

to their truth, because she did nothing to make sure that Brock's Property would be protected in

the transaction, and despite referring Brock to White and Thomas, she did not investigate

whether Brock would be taken care of by White and Thomas or whether Brock's Property would

be returned to her.  Hudgins' actions also demonstrate her reckless disregard to whether Brock

would receive the money she needed from the buyback.  Hudgins accepted $1,000 from Brock

for being helpful with the buyback, and was aware that Brock received less than $50,000 from

the buyback, which was transferred into their joint account, and from which Hudgins took

$19,000 for herself.

26.     Hudgins intended for Brock to rely on her representations because she knew she

would likely receive money from Brock after the buyback.  Hudgins advised Brock about her

finances and allowed her to open the joint account, with statements mailed to a third party.

Brock was justified in relying on her longtime friend and beautician, who had been giving her

money, food, and advice on her finances and Property.  Had Hudgins not made representations to Brock about the buyback, Brock would not have suffered the subsequent financial injuries.

27.     By clear and convincing evidence, Hudgins is liable for defrauding Brock.

Fraud-White

28.     White represented to Brock that he was going to provide her with credit repair services and that he thought it was a good idea to engage in the buyback.  He made representations to Brock knowing of their falsity or at least with reckless disregard to their falsity.  He had never provided credit repair services before, he was only then learning "the business," the only person teaching him was Thomas, and he has failed to produce any evidence of his "services."  White also claims he did not understand the buyback transaction, yet was present with Thomas during discussions with Brock and knew that Buckman was a broker who could conduct "bridge-loans" or buybacks.  White, despite his claim that he did not understand the specifics of the transaction, knew that Brock, in her age and health, would not be able to repurchase the Property at the end of the year.

29.     Brock justifiably relied on White's representations about his credit repair services and his encouragement to engage in the buyback.  Brock was harmed by White's role in her loss. Clear and convincing evidence shows White is liable for defrauding Brock.

Fraud-Thomas

30.     Thomas made several representations to Brock about the buyback, including that money would be placed into an escrow account and used to pay the mortgage, and that Brock would be able to buy back the Property at the end of a year or a year and one half.  Thomas also represented that she would perform future personal care services for Brock for five years.

23

31.     Thomas' representations about the buyback were material to Brock, who sought to protect the Property that had been in her family for approximately 80 years.[12]  Further, Thomas' false representations about personal care services to Brock were material, because Brock no longer had any family in the area to help her.

32.     Thomas made those representations knowing of their falsity, or at least with reckless disregard to whether they were true.  Although Thomas had real estate experience and had advised Brock and Decedent to enter into the transaction, she failed to review the HUD-1 or ask to see Fresh Start's invoice.  Thomas' sole objective at the closing was to provide Unique Management's invoice to Buckman and receive her $67,000 payment.

33.     Thomas also falsely told Brock that she would be able to get her house back at the end of 12 to 18 months.  Thomas could not have believed that Brock, having poor credit, health problems, along with her ailing husband, could possibly purchase the Property within one year of selling it after receiving less than $50,000 for a Property worth $380,000.  Moreover, Thomas falsely said Buckman was going to pay the Property's mortgage.  She did not ask Buckman how much she was keeping for the mortgage payments.  Even after the Property went into foreclosure, Thomas failed to hold Buckman responsible.

34.     Thomas intended to mislead Brock because Thomas was going to be paid more than $67,000 from the buyback, which Brock could not have afforded otherwise.  Conveniently for Thomas, she received prepayment for her services, ensuring her receipt of that money even after Brock was left without any money or her family home.

---

[12]     As discussed above, contrary to Chicago's claim to support fraud, there is no evidence Thomas was supposed to hold the money in trust for Brock's benefit.  See supra at p. 19 n.11.

35.     Brock also reasonably relied on Thomas' misrepresentations because Thomas claimed she had real estate experience, and White and Hudgins, both of whom she trusted, introduced her to Thomas.

36.     Finally, Brock's financial loss of more than $67,000 and the loss of money related to the buyback was proximately caused by Brock's reliance on Thomas' misrepresentations.  If Thomas had not been introduced to Brock, Brock would not have entered into the buyback transaction.  Thomas took the money for services that she admits she never performed.

37.     Chicago has shown by clear and convincing evidence that Thomas is liable to Brock for fraud.

38.     Thomas argues: she was not a party to the scheme to defraud Brock; Brock completed a lawful sale of her Property; and Brock was willing to go forward with the sale because she needed the money.  Thomas' Prop. Findings at 1-3.  Brock, however, was lulled into transferring the Property's title to the Foxworths based on Thomas' misrepresentations.  Brock's need for money and vulnerability made her particularly susceptible to dependency on someone purporting to be an expert in real estate.

Fraud-Buckman

39.     Buckman represented to Brock that the buyback proceeds would be held in escrow and used to pay the Property's mortgage until Brock re-purchased the Property after one year.

40.     These representations were material to Brock's consent to the buyback, because Brock needed money and would have wanted to know if she was going to lose her family Property.

41.     Buckman knew the representations were false.  Buckman put the funds in Fresh Start's operating account and failed to pay Brock's mortgage, resulting in foreclosure.  Buckman did not know how many months of the Property's mortgage were paid.  She also knew Brock would not likely be able to repurchase the Property in a year, given the Property's value, Brock's poor credit, age, medical bills, and husband's declining health.

42.     Buckman intended for Brock to rely on her representation, so that she could receive the majority of Brock's buyback proceeds, Fresh Start's fee from the buyback, money for the Foxworths, and a fee from American One.  Her invocation of the Fifth Amendment at the trial resulted in all evidentiary inferences against her.

43.     Brock was justified in relying on Buckman's representations, because Buckman claimed to have knowledge of the real estate and buyback transactions.

44.     Buckman argues Brock could not qualify to repurchase the Property because Decedent died during the 12-month period following the closing.  Buckman's Prop. Findings at ¶ 4-5.  This claim is inconsistent with Buckman's concession that she failed to pay the mortgage, resulting in the foreclosure.

45.     Brock's financial loss was proximately caused by her reliance on Buckman's misrepresentation that the money she took was going to pay the mortgage and that the mortgage was in fact going to be paid.

46.     There is clear and convincing evidence that Buckman is liable for fraud.

**Civil Conspiracy**

47.     The elements of civil conspiracy claim are: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose;

26

and, (3) actual legal damage[.]"  Fid. Nat. Title Ins. Co. v. Craven, No. 12-4306, 2012 WL

5881856, at *12 (E.D. Pa. Nov. 21, 2012) (quoting Commonwealth v. TAP Pharm. Prods., Inc.,

36 A.3d 1112, 1144 (Pa. Commw. Ct. 2011)).  "Proof of malice, or intent to injure, is also an

essential part of a cause of action for conspiracy."  Id. (quoting TAP Pharm. Prods., Inc., 36

A.3d at 1144.  "Malice requires proof that the conspirators took unlawful actions with the

specific intent to injure the plaintiff, instead of simply furthering their own interests through

unlawful means."  Id. (citing TAP Pharm. Prods., Inc., 36 A.3d at 1185).

Defendants' Civil Conspiracy

48.     Hudgins, White, Thomas, and Buckman conspired to violate their fiduciary

duties, see Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 417 (E.D. Pa. 2006)

("While no court has specifically held that breach of fiduciary duty is an unlawful act for

purposes of a civil conspiracy claim, this Court does so on the ground that breach of fiduciary

duty is a basis for a civil cause of action."), and commit fraud.

49.     Defendants acted with a common purpose of violating their duties and committing

fraud through their interactions with Brock and their close relationships with each other.

Hudgins referred Brock to White and Thomas to obtain money from the Property.  White and

Thomas went together to Brock's Property to gain Brock's trust and provide "advice" on how to

use her Property to obtain funds.  White and Thomas further intended to injure Brock by taking

her money for fictitious services.  Thomas and White then contacted Buckman, who had

previously worked with Thomas.  White knew Buckman could do a buyback, something other

brokers could not, even though Brock had poor credit and an inability to pay a large mortgage.

50.     Defendants performed the following overt acts in pursuit of their common

purpose:  (1) Hudgins suggested the buyback to Brock; (2) Hudgins referred Brock to White; (3)

White introduced Thomas to Brock; (4) White and Thomas stole $67,000 disguised as prepayment for fictitious services and $5,400 for bogus credit repair services; (5) Thomas advised Brock and Decedent to sell their Property as part of the buyback; (6) Thomas spoke to Buckman about Brock's Property; (7) Thomas relayed details about the transaction to Brock and Decedent; (8) Hudgins opened a bank account with Brock and put an address for a third-party on the account; (9) Thomas submitted Unique Management's invoice to Buckman for prepayment for fictitious services; (10) Buckman had her parents pose as "investors" to purchase Brock's Property; (11) Thomas arranged for and notarized Decedent's power of attorney, which ensured that neither Decedent, nor Alfonso, would attend the closing; (12) White, Thomas, and Buckman went to Brock's Property for the "closing;" (13) Buckman took the money from the transaction and put it into Fresh Start's operating account; (14) Thomas stole more than $67,000; (15) White stole $5,400 after the buyback for "credit repair services;" (16) Buckman gave her parents an investor fee; and (17) Hudgins accepted $1,000 from Brock for being helpful with the buyback and the joint account, where Brock's buyback proceeds were wired.

51.     Brock suffered actual legal damages in the buyback transaction, the culmination of Defendants' conspiracy to violate their fiduciary duties and commit fraud.

52.     Chicago has shown by a preponderance of the evidence that Hudgins, White, Thomas, and Buckman engaged in a conspiracy, and are jointly and severally liable for the damages they caused Brock.

**RICO Violations**

53.     Although Chicago asserts a RICO claim against all the Defendants in its proposed conclusions of law, Buckman is the only remaining Defendant in this case named under this count.[13]  Am. Compl. ¶¶ 141-58.

54.      "Any person injured in his business or property by reason of a violation of [the RICO statute may sue and recover] threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"  § 1964(c).

55.     To establish a civil RICO claim, a plaintiff must prove, by a preponderance of the evidence, that a person: (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity.  In re Brokerage Antitrust Litig. 618 F.3d 300, 362-63 (3d Cir. 2010) (citing Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004); Wiley v. Hughes Capital Corp., 746 F. Supp. 1264, 1295 n.29 (D.N.J. 1990) ("The same elements must be proved for a civil RICO action as for a criminal action, but the standard of proof in the civil action is a preponderance of the evidence, while a conviction under RICO requires proof beyond a reasonable doubt." (citing McClendon v. Continental Group, Inc., 602 F. Supp. 1492, 1511 (D.N.J.1985) and Eaby v. Richmond, 561 F. Supp. 131, 134 (E.D. Pa.1983)).

56.     There are two types of enterprises: (1) "organizations such as corporations and partnerships, and other 'legal entities[;]'" or (2) "'any union or group of individuals associated in

---

[13]     Chicago moves for judgment on the RICO claims against all Defendants, which would include Hudgins, White, Thomas, and Buckman.  Although the Amended Complaint names all of the Defendants under the RICO conspiracy count, it named only Buckman, Fresh Start, American One, and Esposito as violators of the substantive RICO claim.  Chicago acknowledged this at trial.  N.T. 12/17/13 at 35-37; see Coleman, 684 F. Supp. 2d at 609 ("a RICO enterprise 'may be comprised only of defendants, or of defendants and non-defendants.'") (quoting United States v. Urban, 404 F.3d 754, 782 (3d Cir. 2005)).

fact although not a legal entity.'"  Fidelity Nat. Title Ins. Co., No. 12-4306, 2012 WL 5881856,

at *12 (E.D. Pa. 2012) (quoting United States v. Turkette, 452 U.S. 576, 581-82 (1981)).

57.     Chicago asserts an "association in fact" enterprise, which must be shown by: (1)

the existence of an ongoing organization, formal or informal; (2) the functioning of a continuing

unit; and (3) an existence separate and apart from the alleged pattern of racketeering.  In re Ins.

Brokerage Antitrust Litig., 618 F.3d at 365 (citation omitted); see Chicago's Prop. (doc. 233) at

38.  There must be sufficient longevity to allow the associates to pursue the enterprise's purpose.

Schwartz v. Lawyers Title Ins. Co., No. 09-841, 2013 WL 4676704, at *4 (E.D. Pa. Aug. 30,

2013) (quoting Boyle v. United States, 556 U.S. 938, 940 (2009)).

58.     A "pattern of racketeering activity" requires at least two acts of racketeering

activity within the span of 10 years.  § 1961(1) (defining "racketeering activity"); § 1961(5)

(requiring two acts).  A plaintiff must show that "(1) the defendants' predicate acts are related,

that is they have similar 'purposes, results, participants, victims, or methods of commission,' and

(2) the defendants' conduct is "continuous.'"  Schatzberg v. State Farm Mut. Auto. Ins. Co., 877

F. Supp. 2d 232, 250-51 (E.D. Pa. 2012) (quoting Zahl v. N.J. Dep't of Law and Pub. Safety, 428

F. App'x 205, 211 (3d Cir. 2011)).

59.     Predicate acts are specific federal and state offenses, § 1961(1), including mail

and wire fraud.  § 1341 (mail fraud); § 1343 (wire fraud).   Such acts must be "continuous" and a

"short term scheme threatening no future criminal activity will not suffice."  Hollis-Arrington v.

PHH Mortgage Corp., 205 F. App'x 48, 54 (3d Cir. 2006) (quoting Kehr Packages, Inc. v.

Fidelcor, Inc., 926 F.2d 1406, 1412 (3d Cir. 1991)).

60.     Chicago alleges that Buckman, along with the Defendants Fresh Start, American

One, and Esposito who are named in the Amended Complaint, conducted an enterprise through a

pattern of racketeering with predicate acts of wire fraud.  See Chicago's Prop. at 38-40.

Although the Amended Complaint is saturated with alleged facts about an enterprise and

predicate acts of mail and wire fraud, Chicago failed to offer sufficient evidence to prove an

enterprise or pattern of racketeering activity.  In its proposed findings of fact and law, Chicago

merely states the elements of RICO, asserts minimal facts without citation, and conclusory avers

that there were multiple violations of wire fraud.  See Chicago's Prop. at 38.

     61.    Chicago failed to establish any type of structure between Buckman, Fresh Start,

American One, and Esposito concerning decision making with the alleged enterprise.  I cannot

determine how they conducted the affairs of the alleged enterprise or whether their actions were

continuous.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 365.

     62.    Moreover, Chicago admitted evidence of only one predicate act—that Buckman

caused the wire transfer of money into Thomas' account.[14]  It offered no evidence of the

interstate nature of that transfer.  Although there is also some evidence that Buckman talked to

Brock on the telephone about the buyback, see N.T. 12/16/13 at 147; Buckman's Dep. at 128,

Chicago failed to show any evidence that these calls were interstate communications, including

where the calls initiated, or when the communication occurred.[15]  Even if Chicago had proved

both predicate acts, they are limited only to Brock's transaction.  Such evidence fails to prove the

allegations in the Amended Complaint of a widespread, continuous pattern of racketeering

---

[14]    Chicago failed to produce evidence of who actually wired the money to the accounts after the buyback.

[15]    Further, it was only White's trial testimony, elicited by Buckman, that showed Buckman spoke to Brock on the phone.  N.T. 12/16/13 at 147.

involving multiple homeowners.[16]  Chicago failed to demonstrate that Buckman's actions were anything more than isolated incidents in a short-term scheme involving Brock's Property.  See Hollis- Arrington, 205 F. App'x at 54.

63.     Thus, Chicago has failed to show, by a preponderance of the evidence, that Buckman is liable for violating RICO.

**RICO Conspiracy**

64.     It is also unlawful to conspire to violate the RICO statute.  § 1962(d); see United States v. Pungitore, 910 F.2d 1084, 1113 (3d Cir. 1990) (RICO conspiracy "is nothing more than an agreement to violate a substantive provision of RICO.").  To prove a § 1962(c) conspiracy, a plaintiff must show: (1) "knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities."  The Knit With v. Knitting Fever, Inc., No. 08-4221, 2011 WL 1161716, at *3 (E.D. Pa. Mar. 30, 2011) (citing Salinas v. United States, 522 U.S. 52, 66 (1997)).  "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).

65.     Because it has failed to show a substantive RICO violation, Chicago also has failed to show Defendants are liable for conspiracy to violate RICO.  See id.; Knitting Fever, 2011 WL 1161716, at *3; Harry Miller Corp. v. Mancuso Chem. Ltd., 468 F. Supp. 2d 708, 719 (E.D. Pa. 2006) ("[W]ithout a RICO enterprise, the [conspiracy] claim cannot succeed: there can be no knowledge of an agreement to facilitate the enterprise's scheme"); Smith v. Berg, No. 99-

---

[16]     Although Buckman's deposition provides some facts to support the existence of an enterprise, Chicago has failed to show any corroborating evidence of continuing racketeering activities.

2133, 1999 WL 1081065, at *2 n.1 (E.D. Pa. Dec. 1, 1999) ("the conspiracy claims must fail if

there was no RICO enterprise with which to conspire.")

66.     Thus, Chicago has failed to show by a preponderance of the evidence that the

Defendants are liable for a RICO conspiracy.

**Damages**

67.     Defendants are jointly and severally liable for the damages they caused Brock.

See In re Ins. Brokerage Antitrust Litig., 282 F.R.D. 92, 113 (D.N.J. 2012), appeal dismissed

(Aug. 13, 2012) ("it is well established that each member of a conspiracy is jointly and severally

liable for all damages resulting from the conspiratorial conduct."); McDermott v. Party City

Corp., 11 F. Supp. 2d 612, 628 (E.D. Pa. 1998) ("a tortfeasor is liable for all the damages which

ordinarily and in the natural course of things have resulted from the commission of the tort."

(quoting Frank v. Volkswagenwerk, A.G. of West Germany, 522 F.2d 321, 323 (3d Cir. 1975)).

68.     Defendants are liable for the amount of Brock's contract sale price of her home

($380,000), less the amount of cash and benefits Brock received from the buyback

($169,644.99).[17]  See 10/10/07 HUD-1 Settlement ($380,000 contract sale price; $49,999 cash

Brock received; $119,480 previous mortgage principal payoff; and $165.99 outstanding water

bill).  Accordingly, White, Thomas, and Buckman are liable in the amount of $210,355.01.

**Punitive Damages and Interest**

69.     Chicago seeks punitive damages and interest from all Defendants.  See Chicago's

Prop. at 28-40.  However, other than stating that the there is "a Constitutionally permissible 9:1

ratio relative to the underlying principal liability," it fails to cite any fact or supporting law for

---

[17]     The principal unpaid balance on Brock's previous mortgage was $119,480.18.  Brock
was assessed additional fees due to the early mortgage payoff, for which I find the Defendants
liable.  Ex. 8, 9/10/07 Mortgage Payoff Statement(assessing interest, a prepayment fee,
escrow/impound overdraft, late charges, recording cost, and payoff statement fee).

finding each Defendant liable for punitive.  Although RICO liability would have justified treble damages, Chicago has failed to prove RICO liability.  Thus, its motion for punitive damages and interest is denied.

**Attorney's Fees**

70.     Because I find Chicago failed to prove its purported RICO claims, I deny its motion for attorney's fees under the statute.  Although Chicago also moves for attorney fees for its successful breach of fiduciary duty and civil conspiracy claims, it has failed to cite any supporting law for its request.  Chicago's Prop. at 40; see Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (noting the ""American Rule" that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary.").

71.     An appropriate Order follows.